Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
Sam S. Shaulson (SS 0460)
Debra Morway (DM 2629)
101 Park Avenue
New York, New York 10178
(212) 309-6000 (Telephone)
(212) 309-6001 (Fax)
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANDREW CLARKE and TAPAS SARKAR,** *Plaintiffs,* *versus* **JPMORGAN CHASE & CO.,** *Defendant.* | Civil Action No. 08-CV-2400 (CM-DCF) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS SUMMARY**
**JUDGMENT MOTION TO DISMISS THE CLAIMS OF PLAINTIFF CLARKE**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     STATEMENT OF FACTS ......................................................................................... 2

    A.      Clarke Managed Capacity Through Q-Tree and Volume Remediation ............................. 4

    B.      Clarke Engaged In Clustering Print Load Balancing ................................. 6

    C.      Clarke Worked On NetBackup Software ................................................. 8

    D.      Clarke Worked On Special Projects ...................................................... 8

    E.      Clarke Engaged In Patching And Scripting To Modify Computer Systems ....................... 9

    F.      Clarke Performed High Level Ticket and Incident Resolution. .............................. 9

    G.      Clarke Directed His Team And Colleagues And Wrote Documentation .......................... 10

    H.      Clarke Used His Own Judgment On Sophisticated Work ................................. 10

    I.      Clarke's Work Was Important To Chase .................................................. 11

III.    CLARKE'S NEW JERSEY OVERTIME CLAIM IS TIME-BARRED ..................................... 12

IV.     CLARKE'S FLSA OVERTIME CLAIM IS TIME-BARRED ........................................... 12

V.      EVEN IF THE COURT ASSUMED A THREE-YEAR FLSA LIMITATIONS
    PERIOD, CLARKE STILL WAS EXEMPT FROM OVERTIME UNDER THE FLSA. ......... 12

    A.      Clarke's Exemption Status Is An Issue Of Law For The Court .............................. 12

    B.      Clarke Was Exempt Under The Administrative Exemption ................................ 13

        1.      Clarke was paid on a salary basis ................................................. 13

        2.      Clarke's work was non-manual .................................................... 13

        3.      Clarke's primary duties directly related to Chase's general business
        operations. ........................................................................... 14

        4.      Clarke used independent judgment on matters of significance ......................... 15

            a.      Clarke exercised discretion and independent judgment ........................... 15

            b.      The discretion Clarke exercised was on matters of significance .............. 19

    C.      Clarke Was Exempt Under The Computer Professional Exemption ................................. 20

    D.      Clarke Was Exempt Under The Combination Exemption ..................................... 24

VII.    CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

Bagwell v. Fl. Broadband, LLC,
385 F. Supp. 2d 1316 (S.D. Fla. 2005) ...................................................................14, 15, 16, 20, 21, 24

Bergquist v. Fid. Info. Servs., Inc.,
399 F. Supp. 2d 1320 (M.D. Fla. 2005)............................................................................................ 24

Bobadilla v. MDRC,
No. 03-Civ-9217, 2005 WL 2044938 (S.D.N.Y. Aug. 24, 2005)...............................................21, 24

Castro v. Metro. Trans. Auth.,
Civ. A. No. 04-1445, 2006 WL 1418585 (S.D.N.Y. May 23, 2006)................................................ 18

Combs v. Skyriver Comm., Inc.,
159 Cal. App. 4th 1242 (2008) ................................................................................. 14, 16, 19, 20

Dymond v. United States Postal Serv.,
670 F.2d 93 (8th Cir. 1982)............................................................................................................. 16

Haywood v. N. America Van Lines, Inc.,
121 F.3d 1066 (7th Cir. 1997) ........................................................................................................ 16

Helfelfinger v. EDS Corp.,
580 F. Supp. 2d 933 (C.D.Cal. 2008) ............................................................................. 14, 16, 17, 18

Hippen v. First Nat'l Bank of Phillipsburg, Kan.,
No. 90-2024-L, 1992 WL 73554 (D. Kan. Mar. 19, 1992).............................................................. 15

Icicle Seafoods, Inc. v. Worthington,
475 U.S. 709 (1986)......................................................................................................................... 13

Kennedy v. Commonwealth Edison Co.,
410 F.3d 365 (7th Cir. 2005)........................................................................................................... 17

Koppinger v. America Interiors, Inc.,
295 F. Supp. 2d 797 (N.D. Ohio 2003) ..................................................................................... 13, 18

Lutz v. Ameritech Corp.,
208 F.3d 214, 2000 WL 245485 (6th Cir. Feb. 23, 2000)........................................................13, 14, 19

Millan v. Citigroup,
Civ. A. No. 07-cv-3769(AKH) (S.D.N.Y. 2008) ..............................................................14, 17, 19

## TABLE OF AUTHORITIES
(continued)

Page

Murray v. Ohio Cas. Corp.,
No. 2:04-CR-539, 2005 WL 2373857 (S.D. OH. Sept. 27, 2005) .................................................................. 13

O'Neill-Marino v. Omni Hotels Mgmt. Corp.,
No. 99 Civ. 3793, 2001 WL 210360 (S.D.N.Y. Mar. 2, 2001) ......................................................... 18

Piscione v. Ernst & Young, LLC,
171 F.3d 527 (7th Cir. 1999).......................................................................................................... 18

Reich v. Haemonetics Corp.,
907 F. Supp. 512 (D. Mass. 1995) ................................................................................................. 16

Renfro v. Indiana Michigan Power Co.,
497 F.3d 573 (6th Cir. 2007)........................................................................................................... 18

## FEDERAL STATUTES AND REGULATIONS

29 C.F.R. § 541.200 ............................................................................................................... 13, 15

29 C.F.R. § 541.201 ..................................................................................................................... 14

29 C.F.R. § 541.202 ................................................................................................... 15, 16, 18, 19

29 C.F.R. § 541.203 ..................................................................................................................... 17

29 C.F.R. § 541.400 ............................................................................................................... 13, 20

29 C.F.R. § 541.708 ..................................................................................................................... 24

29 U.S.C. § 207 ........................................................................................................................... 12

29 U.S.C. § 213 ........................................................................................................................... 13

29 U.S.C. § 255 ........................................................................................................................... 12

## STATE STATUTES

N.J.S.A. § 34:11-56a25.1 ............................................................................................................. 12

## I.     PRELIMINARY STATEMENT

Plaintiffs Andrew Clarke and Tapas Sarkar claim that JPMorgan Chase Bank, N.A. ("Chase"), improperly named as JPMorgan Chase & Co. in the Complaint, misclassified them as exempt from overtime.  They also seek to represent a class of hundreds of information technology employees regardless of what job titles they held, the job duties they performed, where they performed those job duties, who their supervisors were, what technology they worked on, what projects they worked on, and how much money they made.  At the inception of this case, however, the Court ruled that it would decide whether Plaintiffs could survive a summary judgment motion before deciding Plaintiffs' motion to certify a collective action under the Fair Labor Standards Act ("FLSA").  As this Court and others have recognized, deciding a summary judgment motion first in this type of case could result in significant judicial efficiency and savings in time and expense for the parties by mooting the class and collective action claims or by otherwise demonstrating that the claims are too individualized for certification.  (See Sarkar Memo of Law at 1).

As for Plaintiff Clarke, a former Chase employee, he claims that he was improperly classified as exempt from overtime pay under the FLSA and New Jersey Wage and Hour Laws ("NJWHL").  (Docket No. 1 ¶¶ 3, 41-43).  Clarke's claims are time-barred, however, because it is undisputed that he was overtime eligible and paid overtime for the entire two-year limitations period under both the FLSA and NJWHL. Assuming for purposes of this motion only that the FLSA's two-year limitations period can be extended to three years for a willful violation, Clarke's FLSA claim still fails because Clarke satisfied the requirements of two different exemptions from overtime during the relevant five-month period.

First, Clarke was exempt under the administrative exemption because he admitted under oath, and his resume and documents he authored during the course of his job before he commenced this litigation, confirm that he meets each of the four requirements for exemption.  Indeed, Clarke concedes that during that short, five-month time period, he was paid almost three times the salary level needed to satisfy the exemption, he performed non-manual work on a computer virtually all of time, his work related to the

general business operations of Chase insofar as he was responsible for supporting the infrastructure of

Chase's computer network, and he exercised discretion and independent judgment in carrying out his duties.

Second, Clarke was exempt under the computer professional exemption.  Clarke not only obtained

computer engineering certifications, but he also concedes that he performed the duties of a computer

professional.  He, for example, admits that he:  (1) consulted with users to determine hardware, software, or

system functional specifications; (2) helped design the architecture of Chase's computer system; (3)

documented computer systems and programs; (4) analyzed computer systems; and (5) tested and modified

computer systems or programs by scripting and installing patches.  Accordingly, the Court should grant

summary judgment and dismiss Clarke's claims.

## II.    STATEMENT OF FACTS

Chase is a global financial services firm that offers a wide variety of products and banking services,

including but not limited to, loans, retirement accounts, mortgages, private banking, treasury securities,

credit cards, retail banking, and auto financing, to outside customers.  (Ex. A at 112-13).[1]  These various

business units are referred to as lines of business ("LOBs").  (Id. at 119-20).  Clarke did not provide any of

these products or services in connection with his employment, but rather, he was employed by Global

Technology Infrastructure ("GTI"), a portion of Chase's Information Technology department that services

all LOBs.  (Id. at 114).  It was Clarke's job to keep the infrastructure running effectively and efficiently and

to support Windows servers as they related to file and print functions.  (Id. at 33, 77).

Clarke worked in Desktop Services and then on a project called OneDesk until January 1, 2005.

(Ex. A at 89; Ex. B ¶2).  At that time, Clarke's job duties changed and he went to work in New Jersey as

part of the Global Desktop Services ("GDS") GDCIO Windows Services Team, within GTI under manager

---

[1] Exhibits cited in this memorandum, Exhibits A-I, are attached to the Affidavit of Debra Morway.  Exhibit A to the Morway Affidavit contains relevant pages from Sarkar's sworn deposition testimony, as well as deposition exhibits from his deposition.  For example, Exhibit 1 attached to Sarkar's deposition transcript will be cited as "Ex A at Dep. Ex. 1."

Mark Grom. (Ex. A at 89-90, 93, 95, 98-99, 108, 114; Ex. B ¶2). On August 1, 2005, Clarke became overtime eligible and a Distributed Computing Engineer I. (Ex. C; Ex. D ¶2). On May 1, 2007, his job title was changed to Technology Operations Analyst. (Ex. C). Clarke remained in this position until June 11, 2007 when he resigned his employment with Chase to work for Barr Pharmaceuticals. (Ex. A at 50-51; Ex. C). Clarke performed the same duties the entire time that he was in the Windows Services Team, which were not the same as the duties he performed while he worked on the OneDesk project. (Ex. A at 97, 106). Clarke performed almost all of his work on a computer from home and in the office. (Ex. A at 99-102, 110).

Before Clarke joined the Windows Services Team, Clarke attended a "boot camp" to obtain his Microsoft Certified System Administrator Certificate ("MCSA"), and also attended classes to earn his Microsoft Certified Professional Certification. (Ex. A at 29-32, 36-37).[2] These certifications, as well as the other classes he took, made him more proficient in supporting Microsoft servers and assisted him in performing his duties at Chase. (Id. at 29-32, 37, 66-67). Clarke testified that the MCSA gave him the "tools of the trade" that he needed to resolve issues with Microsoft servers. (Id. at 35, 66-67).

While working on the Windows Services Team, Clarke "[m]anage[d] the File & Print, Disaster Recovery Infrastructure." (Ex. A at Dep. Ex. 31). He supported Windows servers all over the country, and had the following duties: (1) Q-Tree remediation for Network Attached Storage ("NAS") and volume remediation, including completing NAS and T-span requests for storage; (2) clustering print load balancing, including completing printer driver updates; (3) working on Netbackup; and 4) working on special projects, including the Investment Bank ("IB") project and the Atlanta IB project. (Ex. A at 120-24, 130-32, 275; Ex. B ¶¶5-23). In connection with his work, Clarke was "one of the cornerstones of Windows support" and

---

[2] Clarke also has an associate's degree in electrical engineering and, in connection with obtaining that degree, took multiple computer network courses. (Ex. A at 23-24). Clarke also took a cadre of other information technology courses. (Id. at 26-29).

"kept the engine running."  (Ex. F).

A.      **Clarke Managed Capacity Through Q-Tree and Volume Remediation.**

Q-Tree and volume remediation, which Clarke testified took the majority of his time (Ex. A at 274-

75), involves the remediation of disk space capacity on servers.  (Ex. A at 148; Ex. F; Ex. B ¶ 9).  In

connection with this work, Clarke "[m]aintain[ed] the global server infrastructure of 1200 Windows servers

and 40 NetApp Filers, [and] disk capacity at 80% or less."  (Ex. A at Dep. Ex. 31).  He was a subject matter

expert ("SME") on resolving server capacity issues.  (Ex. E at 157-58; Ex. A at Dep. Ex. 33).  Capacity

management is the process of forecasting future capacity needs, shifting data to accommodate a business'

needs, building new environments by deploying and implementing new servers and NAS devices for file,

print, and applications delivery, understanding business requirements, determining if a server or a NAS

device is large enough given the business' future capacity needs, and determining options for servers and

NAS devices to ensure proper data capacity at all times.  (Ex. E at 184-85; Ex. A at 150-53, 190-93; Ex. B

¶6).[3]

If a server or group of servers did not have sufficient capacity after the removal of the aged data and

defect files, Clarke would work to migrate data to a [new] larger volume(s) or expand an existing volume in

---

[3] An active directory ("AD") is a group of objects, such as servers, printers, users, and groups that are all
managed under one tree, like a database.  (Ex. A at 140).  Each server is an object in an AD and is a sharing
device that hosts files and data that multiple users need to access.  (Id. at 33, 36, 142; Ex. E at 89-90).  Two
servers are typically clustered together for failover and redundancy reasons – if one goes out of commission
then it is not transparent to the user, but the usage switches without interruption to the other server(s) in the
cluster.  (Ex. A at 125-26).  In addition, servers appear in clusters so that they can house a large amount of
data and other resources, and common resources can be shared across many groups on a large computer
system.  (Ex. B ¶3).  When servers appear in a cluster, then the proper reference is not to the physical server,
but to a virtual server because of the servers' ability to work together.  (Id.).  When servers appear in a
cluster, a frame houses storage on physical disks, and the frame is attached by cables to the cluster of
servers.  (Id.).  Chunks of storage from the frame are called volumes and are assigned to the server clusters.
(Id.).  Typically, a volume is also referred to as a virtual server.  (Id.).  Volumes are logical divisions of the
storage space on the disks that are allocated to the different LOBs.  (Id.).  Logical volumes, therefore, can
span many different physical servers.  (Id.).  A Q-Tree is a storage allocation folder within a specific
volume.  (Id.).  Each folder may be accessed by one individual or a group of individuals, but in order to
access the folders, the individuals must obtain the right to access the folders.  (Id.).

order to obtain more capacity.  (Ex. A at 149-50, 192-93).  When planning to migrate data, Clarke chose

from multiple options.  (Id. at 193-94).  To prepare a migration plan, Clarke would first consult with his

internal clients (the LOBs) to gather information so he could understand their needs, determine the amount

of data they needed to store, and weigh options to determine how to best solve their capacity problems.  (Id.

at 119-20, 150-53, 190-94; Ex. E at 190, 258-59).  When considering the migration plan, Clarke looked at

the size of the different folders on the Q-Tree and who had access to each folder[4], the manner in which the

data was backed up, whether the LOB had specific archiving parameters, and other needs of the LOB.  (Ex.

A at 194-96, 201, 204-05, 212, Dep. Ex. 41).  After considering all of these factors, Clarke looked at

available options and provided the LOBs with information on how they could remedy their capacity

problem and the pros and cons of all available options to do so.  (Id. at 196-97).  When Clarke provided

more than one option, he would also provide recommendations to assist the LOB in choosing one option

over another.  (Id. at 154-57, 190, 196, Dep. Ex. 40; Ex. E at 190, 309-11).

　　　In one email, for example, Clarke recommended a plan to remediate a data capacity issue to

individuals on the NAS and storage teams.  (Ex. A at 152, 158-60, 162, Dep. Ex. 34; Ex. E at 283-86).  In

his e-mail, he discussed the pros and cons of his recommended plan, and he recommended his solution over

other available options.  (Ex. A at 158-60, 168-71, Dep. Ex. 34).  In fact, Clarke recommended a different

option that posed less of a business impact than the option recommended by John Marino, the supervisor of

the NAS team.  (Id. at 158, 170-71, 174-75).  The storage team ultimately accepted his suggestion.  (Id. at

175).

　　　Clarke created numerous remediation plans offering many available options and presented those

plans to the LOBs.  (Id. at 190-93, 201-03, 205, 215-16, 225-30, 290-92, Dep. Exs. 40, 41, 42, 47; Ex. E at

309-11, 318-19).  Sometimes, his recommendations were contrary to even the views of project managers or

---

[4] The fewer individuals with access to a folder, the easier it will be to migrate the data.  (Ex. A at 194-95).

department heads. (Ex. A at 236). However, as a result of carefully thought out impact analyses, Clarke's plans and recommendations typically presented the best options for resolution, and were generally adopted by the LOBs. (Id. at 174-75, 199-200, 239).

Clarke's manager did not always know about his plans before they were presented to and accepted by the LOBs. (Ex. A at 208-10, Dep. Ex. 43 Ex. B ¶8; Ex. E at 46-47, 279). As set forth in one email from Clarke, for example, he devised a capacity management plan for a LOB and began its implementation without input from his manager. (Id.). When Clarke could not implement his original plan because it was not feasible, he changed the plan, implemented the new plan, and informed his manager of the situation only once he implemented the revised and final plan. (Ex. B ¶8; Ex. A at Dep. Ex. 43). In addition to devising capacity management plans, Clarke also proactively monitored servers to avoid potential issues with lack of disk space. (Ex. F).

**B.** **Clarke Engaged In Clustering Print Load Balancing.**

In addition to Q-Tree and volume remediation, Clarke engaged in clustering print load balancing. (Ex. A at 275). As Clarke stated on his resume, he "[c]onfigure[d,] and [m]aintain[ed] MS Cluster Server[s] to provide high-availability and fault-tolerant on [the] 2003/2000 Enterprise Server." (Id. at Dep. Ex. 31).[5] Configuration is the process of taking a users' specifications and customizing software or another computer operating system, like a server, so that it meets the users' needs. (Ex. B ¶10).[6] The cluster configuration that Clarke performed is necessary to ensure proper failover for both print functions and data storage. (Id.). A failover occurs when one server in a cluster ("main server") stops functioning properly and all of its functions and resources transfer over to other working server(s) in the cluster ("failover servers"). (Id. ¶11). There are many different options to configure a cluster to complete a failover. (Id.). Clarke consulted with

---

[5] An Enterprise server is a type of Microsoft server that is used when servers are clustered together. (Ex. B ¶4).

[6] The clusters that Clarke was responsible for configuring and maintaining housed 100 to 800 print queues, a terabyte of data, and 600 gigabytes of applications. (Ex. A at Dep. Ex. 31).

the LOBs directly regarding the different options and the risks associated with each option. (Id.; Ex. A at

Dep. Ex. 31). For example, in connection with configuring a cluster for a failover, Clarke had to determine:

(1) what server(s) or virtual server(s) to utilize as the failover server(s); (2) if the function would

immediately failover or if the main server would try to correct itself before failover occurred; (3) if a failover

occurred, whether the main server shut down; (4) if the main server started working again, whether the

function returns to the main server or remains with the failover server; and (5) if the function was to return to

the main server, when it would do so. (Ex. B ¶11). In addition to configuring server clusters to perform

proper failover, Clarke configured them to provide proper printing services when he assigned the correct

printer drivers to a printer and ensured that each driver loaded onto the main server was also loaded onto the

designated failover server(s). (Ex. A at 142).

       Clarke not only configured the clustered servers, but also maintained them by managing the

resources that resided on the servers by ensuring proper failover at all times. (Ex. B ¶12; Ex. A at Dep. Ex.

31). Clarke was very knowledgeable in this field and, as a result, when a clustering issue arose, he was the

last point of escalation, and he solved clustering problems that no-one else on his team could solve. (Ex. A

at 135-37). Although Clarke was responsible for configuring clusters to properly failover, inevitably a

failover scenario would result in unanticipated problems. (Ex. B ¶14). When a problem arose, Clarke

consulted with the impacted LOB regarding the problem, evaluated the problem, and informed the LOB of

the potential impact. (Id. ¶15). For example, in order to address a clustering issue, at times, Clarke had to

shut down all or part of a server's resources, and would discuss the timing of the shutdown, the resources it

would impact, the nature of the impact, and the duration of the impact with the LOB. (Id.). Clarke's goal

was to minimize the impact on the LOB, and he recommended different options to the LOB with that in

mind. (Id.). Clarke also minimized the impact on the LOBs by upgrading the computer system by applying

the latest operating system patches. (Ex. A at 142).

### C.      Clarke Worked On NetBackup Software.

Clarke also worked on NetBackup software.  (Ex. A at 275).  Veritas NetBackup is software that is installed and configured on backup servers to enable the backup of data to occur.  (Ex. B ¶17).  The Netbackup program ensures that all data on a server is backed up – the process of placing data on not only a primary server, but also an exact replication of the data on a backup server to permit data recovery in the event that the data is lost from the primary server.  (Id. ¶16).  Each LOB had its own customized backup policies.  (Id. ¶19).  Clarke "set up policies and retention periods" for each LOB after consulting with the LOB to create the policies, and then configured the NetBackup Servers by customizing the NetBackup software to backup data in adherence to the LOBs' customized backup policies.  (Id. ¶19; Ex. A at Dep. Ex. 31).  His configuration essentially enabled the servers in the NetBackup system to properly communicate with one another to backup the LOBs' data.  (Ex. B ¶18; Ex. A at Dep. Ex. 31).  In connection with this work, Clarke installed and configured software and then tested the software configurations in the live environment to ensure proper functionality.  (Id.).  In addition, Clarke wrote instructions for his team members that assisted in the maintenance of the program by ensuring the proper management of each LOB's backup procedures.  (Ex. B ¶20; Ex. A at Dep. Ex. 31).

### D.      Clarke Worked On Special Projects.

During his time in the Windows Services Team, Clarke participated in a project for the IB LOB involving disaster recovery testing as the representative from his team on the project.  (Ex. A at 269-70).  In fact, Mark Grom did not go to project meetings, but instead, relied on Clarke to attend the meetings.  (Id.).  As part of this project, Clarke conducted testing of IB's disaster recovery system.  (Id. at 270).

Clarke also worked on the Atlanta IB project, and in connection with this project, discussed project requirements with the LOB and engineering.  (Ex. A at 277-79).  He assisted in the build out of the entire Atlanta facility by ensuring proper server configuration and implementation and configuration of disaster recovery processes.  (Ex. B ¶21).  Thereafter, Clarke completed testing to ensure proper implementation.

(Ex. A at 279).

      **E.**      **Clarke Engaged In Patching And Scripting To Modify Computer Systems.**

      Clarke wrote scripts, a computer program that instructs a computer what to do, in Microsoft

VBscript and NT Shell Scripting.  (Ex. A at 71, 336-37; Ex. G at 152).  His scripts enabled manual work to

be performed automatically.  (Ex. A at 337).  In his 2005 Performance Review, Clarke explained that he

utilized these scripts to point to new servers in connection with his work decommissioning other servers.

(Ex. F).  In addition, through scripting, he "set up a process via the Alita tool to continuously synchronize

the shares and a reporting tool that send[s] an email to our group that [they] check to ensure all production

shares are replicating to the DR Filers."  (Id.).  Through scripting, Clarke automated the process to obtain

reports regarding whether the backup software was sufficiently backing up or replicating data to the backup

systems.  (Id.).  Clarke also modified a script that enabled his group to automatically delete defect data and

move aged data.  (Ex. E at 293-98).  In addition to utilizing scripting, Clarke modified computer operating

systems when he "[m]aintain[ed] the latest Microsoft Security patches thru out of global server

infrastructure of 1200 Servers."  (Ex. A at 352, Dep. Ex. 31).

      **F.**      **Clarke Performed High Level Ticket and Incident Resolution.**

      A Peregrine ticket is an electronic form that is filled out when a user, multiple users, or a LOB

experience computer issues.  (Ex. G at 193, Ex. H at 113).  Peregrine tickets typically originate with the

Helpdesk (level one), and if the Helpdesk cannot solve the problem, it escalates the issue to Desktop

Support (level two).  (Ex. G at 193-94, Ex. A at 248-50).  Clarke provided "level three" support for the

global infrastructure of 2,500 users – i.e., when second level support could not solve a problem, it was up to

Clarke to resolve the issue.  (Ex. A at 249-51, Dep. Ex. 31).  Clarke also served as the fourth-level escalation

point if another individual on the Windows Services Team had an issue with clustering print load balancing

that they could not resolve.  (Id. at 136-37).  There is not always a troubleshooting technique in existence for

every problem, and when there was no set of documentation that contained an answer, Clarke applied his

expertise and judgment to decide how to solve the problem.  (Id. at 257-58, 284, 302-03).

G.     **Clarke Directed His Team And Colleagues And Wrote Documentation.**

Clarke engaged in brainstorming with his co-workers on how to solve problems.  (Ex. A at 283-84).

Indeed, his colleagues and clients sought him out when they needed assistance solving difficult problems,

and asked him to provide recommendations.  (Id. at 136-37, 216-18, 343, Dep. Ex. 44).  While on the

Windows Services Team, Clarke was responsible for informing project managers of his team's procedures

and to ensure that those procedures were followed.  (Id. at 222-24).

Time and time again, Clarke shared his knowledge regarding clustering with other Chase

employees who were not as proficient as he.  (Ex. A at 128-29, 338).  In addition, he "[t]rained off-shore

staff to monitor our Windows 2000/2003 global backup Infrastructure[, r]equest tape changes and restore

data using Veritas Netbackup Enterprise Server 4.5/5.1 and Backup Exec 8.5/9.1."  (Id. at Dep. Ex. 31).

In order to assist his colleagues, Clarke identified the content for and wrote a disaster recovery

document that set forth the proper procedures to use to recover data in the event of a disaster.  (Ex. A at 329-

31, Dep. Ex. 31, 50; Ex. F).  In addition, Clarke documented the process for Share Synchronization of the

NETAPP Filers, a type of NAS device.  (Ex. B ¶ 22; Ex. F).

H.     **Clarke Used His Own Judgment On Sophisticated Work.**

Clarke admits that he was a "detailed oriented technology professional.  (Ex. A at 59, Dep. Ex. 31).

He engaged in challenging, sophisticated work that was more technologically complex than work

performed by the Helpdesk.  (Id. at 65, 294).  In his 2005 Performance Review, Clarke stated that he had

strong technical skills and that he tried to "keep abreast of technology advances adding new skills to his

toolbox."  (Ex. F).  Clarke used that toolbox to "think independently" within the technology field, to resolve

issues multiple times per day, and to work on root cause analysis, which consists of trying to determine

exactly what happened and why.  (Ex. A at 255, 262-63, 280).  When he dealt with unique situations and/or

there was no answer in any manual, Clarke used his own expertise and applied his own judgment to identify

the root cause of the problem and come up with a solution.  (Id. at 303-06).  Similarly, although he claims that his skills and knowledge came from manuals, the exact resolution to a problem might not be in the manual, and in such cases, Clarke applied his expertise to solve the problem.  (Id. at 303, 305-06).  In fact, Clarke's expertise in his areas of specialization was so advanced, he performed tasks that his manager could not. (Ex. E at 183-84).

Clarke knew when to make an independent decision, when to check with others, and when decisions needed to be escalated.  (Ex. A at 299-301).  Clarke worked independently, testifying that "[i]f [he] was given a task to do, [he] could follow through without someone…following [him] each step of the way."  (Id. at 67).  In fact, Clarke admitted that his supervisor, Mark Grom, did not actively manage him when Clarke completed his job duties.  (Id. at 67-68).  Instead, Grom gave Clarke the flexibility to handle issues on his own.  (Id. at 297).  For example, Clarke used his judgment to identify servers that were underutilized and suggested when servers should be decommissioned.  (Id. at 343-44).

At any given time, Clarke balanced many different projects and issues, such as emergency requests for storage, multiple Q-Tree and volume remediations, patching, testing, and work on NetBackup.  (Ex. A at 344-49, Dep. Ex. 31).  Each day was different, and on a daily basis, he used his judgment to determine how to prioritize these tasks based on the nature of tasks outstanding, their time sensitivity, and their seriousness. (Ex. A at 344-49; Ex. E at 135).

## I.       Clarke's Work Was Important To Chase.

More than 2,500 users were affected by Clarke's work managing the File & Print, Disaster Recovery Infrastructure.  (Ex. A at 250, Dep. Ex. 31).  In connection with his work, Clarke was "one of the cornerstones of Windows support" and "kept the engine running."  (Ex. F).  If a LOB, such as the IB, could not print or store its data, the negative financial ramifications for Chase could be incalculable.  (Ex. A at 266-67, Ex. E at 291; Ex. B ¶23).  Moreover, if the IB LOB could not access its data, it would be a serious problem for the business.  (Ex. A at 268-69).

III.   **CLARKE'S NEW JERSEY OVERTIME CLAIM IS TIME-BARRED.**

The statute of limitations under the NJWHL for overtime claims is two years and runs from the date a plaintiff commences an action.  N.J.S.A. § 34:11-56a25.1.  Because Clarke filed his Complaint on March 7, 2008 (Docket No. 1), any claim for overtime prior to March 7, 2006 is untimely.  It is undisputed that Clarke was overtime eligible and received overtime payments beginning on August 1, 2005 through the end of his employment with Chase in June 2007.  (See supra at 3).  Thus, Clarke's NJWHL overtime misclassification claim is time-barred and should be dismissed.

IV.   **CLARKE'S FLSA OVERTIME CLAIM IS TIME-BARRED.**

The statute of limitations under the FLSA for overtime claims is also two years.  29 U.S.C. § 255(a).  Again, because it is undisputed that Clarke was overtime eligible and received overtime payments during the two-year period preceding the commencement of this action (see supra at 3), his FLSA overtime misclassification claim for this two-year time period is time-barred and should be dismissed.

V.   **EVEN IF THE COURT ASSUMED A THREE-YEAR FLSA LIMITATIONS PERIOD, CLARKE STILL WAS EXEMPT FROM OVERTIME UNDER THE FLSA.**

The two-year statute of limitations period for FLSA claims can be extended to three years upon a finding of willfulness.  29 U.S.C. §255(a).  As demonstrated below, however, even if the Court were to assume a three-year FLSA limitations period for purposes of this motion, Clarke still has no FLSA claim.  This is true because he was an exempt administrative employee and computer professional during the five-month period (March 7, 2005 - August 1, 2005) he worked within the three-year limitations period without receiving overtime.

A.   **Clarke's Exemption Status Is An Issue Of Law For The Court.**

Section 7 of the FLSA requires employers to pay overtime compensation to any non-exempt employee who works in excess of forty hours in a regular workweek.  29 U.S.C. § 207(a).  The FLSA, however, expressly exempts from this overtime pay requirement any employee who is paid a salary and

works in a "bona fide executive, administrative, or professional capacity," id. § 213(a)(1), as well as individuals who are computer professionals. 29 CFR §§ 541.400. In FLSA wage and hour cases, the ultimate decision of whether the duties and activities of an employee qualify as exempt work is a question of law for the court to resolve. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).

### B. Clarke Was Exempt Under The Administrative Exemption.

Under the FLSA's administrative exemption, Chase is entitled to summary judgment if: (1) Clarke received a salary of at least $455 per week; (2) Clarke's primary duty consisted of the performance of non-manual work; (3) Clarke's primary duty directly related to management policies or general business operations; and (4) Clarke's primary duty included the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. §§ 541.200.

### 1. Clarke was paid on a salary basis.

As to the first requirement for the administrative exemption, Chase paid Clarke an annualized salary, broken down over the course of the year into equal payments, of far more than $455 per week. (Ex. A at 117). As Clarke's annual salary was more than $67,000.00 per year in 2005, he made almost three times the amount required to meet the exemption. (Id.).

### 2. Clarke's work was non-manual.

Under the administrative exemption, Clarke's primary duties must consist of the performance of office or non-manual work. 29 C.F.R. § 541.200(a)(2). Because Clarke testified that he spent virtually all of his time working both at his office and home office on a computer, he easily satisfies this requirement. (Ex. A at 99-102, 110). See, e.g., Murray v. Ohio Cas. Corp., No. 2:04-CR-539, 2005 WL 2373857, at *5 (S.D. OH. Sept. 27, 2005) (finding plaintiff's work, which consisted of working in her home office "using a telephone, computer, and fax machine," was non-manual); Lutz v. Ameritech Corp., 208 F.3d 214, 2000 WL 245485, at *3 (6th Cir. Feb. 23, 2000) (finding work non-manual when primary duty centered around designing and overseeing plan to provide employer access to intra-office computer network); Koppinger v.

Am. Interiors, Inc., 295 F.Supp.2d 797, 802 (N.D. Ohio 2003) (finding maintenance, upgrading, and administering computer systems primarily non-manual); Bagwell v. Fl. Broadband, LLC, 385 F.Supp.2d 1316, 1323 (S.D. Fla. 2005).

### 3.   Clarke's primary duties directly related to Chase's general business operations.

The third requirement for the administrative exemption is that the work be directly related to the employer's management or general business operations.  29 C.F.R. § 541.201(a).  The Regulations differentiate "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id.  Section 541.201(b) of the Regulations provide that the following type of work is directly related to management or general business operations:

> [T]ax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; ***computer network, internet and database administration***; legal and regulatory compliance; and similar activities.

See 29 C.F.R. § 541.201(b) (emphasis added).  Thus, according to the U.S. Department of Labor ("DOL"), working on an employer's computer network is a prototypical example of administrative work.  Id.; see also Millan v. Citigroup Inc., Civ. A. No. 07-cv-3769(AKH), (S.D.N.Y. May 14, 2008), Ex. I at 29 (plaintiff who serviced business by supporting the computer network was involved in work directly related to general business operations); Combs v. Skyriver Comm., Inc., 159 Cal.App.4th 1242, 1265 (2008) (performance of capacity and expansion planning to maintain the network was work directly related to employer's business operations); Helfelfinger v. EDS Corp., 580 F.Supp.2d 933, 961-62 (C.D.Cal. 2008) (administration of company's databases, including maintaining proper server capacity, is work directly related to general business operations); Lutz, 2000 WL 245485, at * 2 (plaintiff's duty of  "providing access to the intra-office computer network to various groups within [the company]" and "solving network problems" was work

directly related to general business operations); <u>Bagwell</u>, 385 F.Supp.2d at 1324-25 (plaintiff engaged in activities directly related to operations of business because plaintiff's job involved advising management and planning and finding network solutions to complex problems).

Here, Clarke admitted during his deposition that he is not involved in the provision of any of Chase's products or services.  (Ex. A at 112-13, 119-20).  Rather, when asked how his work related to Chase's business, he testified that it was his job to keep the infrastructure running effectively and efficiently and to support Windows servers, as they related to file and print functions.  (Ex. A at 33, 77).  Thus, his work was directly related to Chase's general business operations and satisfies the third element of the administrative exemption test.

### 4. <u>Clarke used independent judgment on matters of significance.</u>

#### a. <u>Clarke exercised discretion and independent judgment.</u>

Clarke's job duties easily satisfy the fourth element of the administrative exemption test, the use of discretion and independent judgment on matters of significance.  The DOL Regulations define discretion and independent judgment as follows:

> In general, the exercise of discretion and independent judgment involves ***the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered***.  The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision, and with respect to matters of significance.

29 C.F.R. § 541.202(a) (emphasis added).

Although Clarke regularly exercised discretion and independent judgment in performing his daily job duties, Chase need only show that Clarke's position ***included*** the exercise of some discretion and independent judgment.  29 C.F.R. §§ 541.200(a)(3); <u>Hippen v. First Nat'l Bank of Phillipsburg, Kan.</u>, No. 90-2024-L, 1992 WL 73554, at *8 (D. Kan. Mar. 19, 1992) ("One important ramification of the 'short test' . . .is that . . .the employee's work need only <u>include</u> work requiring the exercise of discretion and independent judgment, as opposed to <u>customarily and regularly</u> exercising such discretion and judgment.")

(emphasis in original); see also Dymond v. United States Postal Serv., 670 F.2d 93, 95 (8th Cir. 1982).

The Regulations also explicitly recognize that the decisions made by exempt employees in the course of performing their duties need not even be final decisions and may be subject to review.  29 C.F.R. § 541.202(c); see also Dymond, 670 F.2d at 96 (holding that employees performed work requiring exercise of discretion and independent judgment where their decisions were subject to approval or even reversal by management); Haywood v. N. Am. Van Lines, Inc., 121 F.3d 1066, 1073 (7th Cir. 1997); Reich v. Haemonetics Corp., 907 F. Supp. 512, 518 (D. Mass. 1995).

Clarke's description of his own duties – corroborated by his resume and documents he authored during his employment prior to filing this lawsuit – more than demonstrate that he exercised discretion and independent judgment in carrying out his daily job responsibilities:

- Clarke testified during his deposition and demonstrated in e-mails he wrote that he commonly weighed options to make decisions in creating capacity management plans.  (Ex. A at 119-20, 149-60, 168-71, 174-75 190-95, 201-05, 212, 215-16, 225-30, 290-92; Dep. Exs. 40, 41, 42, 47).  In connection with resolving high-level Peregrine tickets, Clarke applied his discretion to make decisions regarding how to solve problems, and he served as a third and fourth-level escalation point.  (Ex. A at 135-37, 249-51, 257-58, 284, 302, Dep. Ex. 31).  Also, in connection with clustering, he weighed options for failover.  (Ex. B ¶11).  See 29 C.F.R. § 541.202 (exercise of discretion involves comparison and the evaluation of possible courses of conduct, and acting or making decision after considering various possibilities); Combs, 159 Cal.App.4th at 1266 (employee engaged in troubleshooting who had authority to determine a course of action to correct a problem exercised discretion); Helfelfinger, 580 F.Supp.2d at 939, 965 (providing solutions to technical issues and providing third and fourth-level support involves use of discretion); Bagwell, 385 F.Supp.2d at 1326 (because plaintiff "determined the exact nature of various network problems and, alone or in collaboration with [his supervisor], structured various problems in a logical manner so that a system to solve the problems and obtain the desired results could be developed," he exercised independent judgment).

- Clarke engaged in root cause analysis, which consists of trying to determine exactly what happened and why, so he could prevent future problems.  (Ex. A at 255, 262-63, 280); See 29 C.F.R. § 541.202 (exercise of discretion involves comparison and the evaluation of possible courses of conduct, and acting or making decision after considering various possibilities).

- Clarke's work configuring and maintaining the Microsoft cluster servers, maintaining the latest Microsoft security patches, managing the file and print and disaster recovery infrastructure, maintaining the global server infrastructure, implementing Veritas NetBackup, and installing, configuring, and maintaining Veritas NetBackup master servers, media servers, and client servers all required the use of independent judgment and discretion.  (Ex. A at Dep. Ex. 31).  See Helfelfinger, 580 F.Supp.2d at 944, 965-66 (finding individual who maintained and managed database application so that system was up

and running by participating in operational support and implementation activities for client data bases, backup, recovery, configuration, upgrades patching, assigning roles, creating users, and trouble shooting exercised discretion and independent judgment;

- Clarke worked as a lead from his team on a project for the IB disaster recovery project, assisted in the build out of an entire facility, gave directions to other teams to ensure that they adhered to his team's guidelines, and provided guidance to employees in India. (Ex. A at 222-24, 269-70, Dep. Ex. 31; Ex. B ¶21). See 29 C.F.R. § 541.203(c) ("[an] employee who leads a team of other employees assigned to complete major projects for the employer…generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team."); Millan, Civ. A. No. 07-cv-3769(AKH), Ex. I at 49-50 (individual who built out lab exercised discretion and independent judgment;

- Members from other teams often sought out Clarke for assistance solving problems and to make recommendations to assist them in performing their work on the computer infrastructure, and Clarke used his judgment to determine what servers were underutilized and when to suggest their decommission. (Ex. A at 136-37, 216-18, 343-44, Dep. Ex. 44); Helfelfinger, 580 F.Supp.2d at 965 (employee exercised discretion and independent judgment when he made recommendations to employer regarding architecture design and installation and replacement of software applications).

- Clarke testified during his deposition and demonstrated in e-mails that he devised capacity management plans. (Ex. A at 190-92, 201-03, 205, 215, 225-30, 290-91, Dep. Exs. 40, 41, 42, 47; Ex. E at 309-11, 318-19). See Helfelfinger, 580 F.Supp.2d at 965 (suggesting architectures and logical representations of network design involves exercise of discretion).

- Clarke used his judgment to suggest alternatives to other groups and the LOBs he advised. (Ex. A at 154-57, 190, 196; Ex. E at 190, 300-11). Helfelfinger, 580 F.Supp.2d at 965 (finding employee exercised discretion and independent judgment when he made recommendations to employer regarding architecture design and installation and replacement of software applications).

- Clarke used his judgment to write instructions to his team members to ensure adherence to LOBs' disaster recovery procedures. (Ex. B ¶20; Ex. A at Dep. Ex. 31). See Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 375 (7th Cir. 2005) (devising instructions to remedy problems involves use of discretion).

- Clarke was a subject matter expert ("SME") on resolving capacity issues, and his colleagues sought him out to remedy clustering issues that they could not solve. (Ex. A at 135-37, Dep. Ex. 33; Ex. E at 157-58). See Helfelfinger, 580 F.Supp.2d at 965 (individual who served as "pointman" for all technical issues related to portion of computer system exercised discretion).

- Clarke's manager, Mark Grom, testified that he did not have the technical knowledge to perform some of the work that Clarke performed. (Ex. E at 183-84). See Helfelfinger, 580 F.Supp.2d at 965-66 (finding when employee's manager did not have technical knowledge to direct his work, employee exercised discretion).

- Clarke testified that "each day was different," and he had to use his judgment to prioritize his tasks based on the nature of the tasks outstanding, their time sensitivity, and their seriousness. (Ex. A at 344-

49; Ex. E at 135).  See Koppinger, 295 F.Supp.2d at 805 (finding employee engaged in exercise of discretion when he decided the priority of tasks and what course of action to take with respect to repair requests); Piscione v. Ernst & Young, LLC, 171 F.3d 527, 537 (7th Cir. 1999) (prioritizing projects involved exercise of discretion).

- To assist his colleagues, Clarke identified the content for and wrote a disaster recovery manual and manual regarding the process for Share Synchronization of the NETAPP Filers, and also drafted backup policies.  (Ex. A at 329-33, Dep. Exs. 31, 50, 51, Ex. F).  See Helfelfinger, 580 F.Supp.2d at 965 (finding plaintiff exercised discretion when he revised, simplified, and clarified a technical guide by using his technical knowledge of the process); Castro v. Metro. Trans. Auth., Civ. A. No. 04-1445, 2006 WL 1418585, at*3 (S.D.N.Y. May 23, 2006) (drafting policies involves use of discretion); Renfro v. Indiana Michigan Power Co., 497 F.3d 573, 577-78 (6th Cir. 2007) (finding writing manuals required exercise of discretion despite the fact that writers looked to various source materials to obtain the information).

More generally, Clarke testified that in the connection with the performance of his duties, he knew when to make an independent decision, when to check with others, and when decisions needed to be escalated.  (Ex. A at 299-301).  He used his technology skills toolbox to "think independently within the technology field," to resolve issues multiple times per day, and to work on root cause analysis, which consists of trying to determine exactly what happened and why, so he could prevent future problems.  (Ex. A at 255, 262-63, 280).  As he also acknowledged in his 2005 Performance Review, he proactively monitored servers to avoid issues with lack of disk space.  (Ex. F).  Clarke, moreover, testified that "[i]f [he] was given a task to do, [he] could follow through without someone … following [him] each step of the way."  (Ex. A at 67).  In fact, Clarke admitted that his supervisor Mark Grom did not actively manage him.  (Clarke at 67-68, 208-10, Ex. E at 46-47, 279).  Instead, Grom gave him the flexibility to handle issues on his own, which further demonstrates his exercise of discretion and independent judgment.  (Ex. A at 297).  See 29 C.F.R. §541.202; O'Neill-Marino v. Omni Hotels Mgmt. Corp., No. 99 Civ. 3793, 2001 WL 210360, at *9 (S.D.N.Y. Mar. 2, 2001) (employee left largely unmonitored because he was trusted by his supervisor exercised discretion).[7]

_____

[7] When Plaintiff Sarkar attempted to solicit individuals to join him in this lawsuit, the only person who accepted was Clarke (Ex. G at 46-48) – the person at Chase who managed network server capacity in the Windows environment whereas Sarkar managed network server capacity in the Novell environment.

Based on his own written words and sworn testimony, Clarke not only exercised discretion, but he exercised discretion daily in carrying out each of his job responsibilities.  Indeed, Clarke exercised more discretion than the plaintiff did in <u>Millan</u>, another IT exemption case in which Judge Hellerstein granted summary judgment to the employer.  <u>Millan</u>, Civ. A. No. 07-cv-3769(AKH), Ex. I at 49-50.  There, the plaintiff provided network connectivity to users, installed network cables, and helped reconfigure a network lab.  <u>Millan</u>, Civ. A. No. 07-cv-3769(AKH), Ex. I at 31, 49.  Judge Hellerstein found that the plaintiff exercised independent discretion and judgment because he was not on a "direct reporting basis" to his manager, and instead, a large part of what he did involved responding to calls made directly to him by the engineer who needed his services.  <u>Id.</u> at 31.  As set forth above, like the plaintiff in <u>Millan</u>, Clarke was not on a direct reporting basis with his manager, but rather, admitted that his manager did not actively manage him, and instead, gave him the flexibility to handle many issues on his own.  (Clarke at 67-68, 297).

### b.   The discretion Clarke exercised was on matters of significance.

There can be no dispute as well that Clarke exercised his discretion on matters of significance or consequence.  29 C.F.R. § 541.202.  Courts have held that employees exercise discretion on matters of significance when they are responsible for making decisions that impact the design and functionality of an employer's computer network.  <u>See, e.g.</u> <u>Combs</u> , 159 Cal.App.4th at 1267 (employee exercised discretion on matters of significance when he quarterbacked effort to solve problems with computer network); <u>Lutz</u>, 2000 WL 245485, at *3 (employee exercised sufficient discretion and independent judgment on matters of significance when he "assesse[d] the needs of clients, develope[d] installation plans for access to the intra-company network, and coordinate[d] with various departments to arrange installation and ensures that plans

According to Sarkar, who claims that his work is "very similar" to Clarke's work, Sarkar coordinates among different groups, continually reviews procedures and recommends changes to eliminate duplication of effort and insure efficiency, accuracy, and timeliness, examines and challenges accepted practices to find better ways to achieve the organization's goals and objectives, and has the flexibility to address and resolve problems on his own by evaluating all of the considerations necessary to make a judgment and makes the best decision that he can with all of the information on his own.  (Ex. G at 263-72, 364, 380-81, 425-26).

[were] implemented."); Bagwell, 385 F.Supp.2d at 1326 (because plaintiff "determined the exact nature of various network problems and, alone or in collaboration with [his supervisor], structured various problems in a logical manner so that a system to solve the problems and obtain the desired results could be developed" he exercised independent judgment on matters of significance).

Here, it is beyond dispute that Clarke exercised discretion on matters of significance.  More than 2,500 users were affected by Clarke's work "manag[ing] the [f]ile & [p]rint, and [d]isaster [r]ecovery [i]nfrastructure."  (Ex. A at 249-51, Dep. Ex. 31).  If Clarke did not perform his job correctly, then the business could have potentially lost data and/or incurred incalculable financial loss.  (Ex. A at 266-67; Ex. E at 291; Ex. B ¶23). Clarke was involved in challenging, sophisticated work that was technologically complex.  (Ex. A at  65, 294).  Like the plaintiff in Combs, Clarke served as the quarterback for resolving critical issues with clustering and capacity management.  (Ex. A at 135-37; Ex. E at 157-58).  Indeed, in connection with his work, Clarke was "one of the cornerstones of Windows support", and "kept the engine running."  (Ex. F).  Given the foregoing, there should be no question that he more than meets the requirements for the administrative exemption.

**C.    Clarke Was Exempt Under The Computer Professional Exemption.**

Clarke not only qualified as exempt under the administrative exemption, but he also was covered by the computer professional exemption.  Computer systems analysts, computer programmers, software engineers, or other similarly skilled workers in the computer field are eligible for exemption as professionals under FLSA section 13(a)(1); see 29 C.F.R. §541.400(a).  To qualify under the computer employee exemption, the employee's primary duty must consist of:

(1)    The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

(2)    The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3)    The design, documentation, testing, creation or modification of computer programs related to

machine operating systems; or

(4)      A combination of the aforementioned duties, the performance of which requires the same level of skills.

(Id.)

Clarke is a true computer professional.  As an initial matter, prior to joining the Windows Services Team, Clarke obtained both his MCSA and MCP certifications.  (Ex. A at 29-32, 36-37).  These certifications gave him the "tools of the trade" that he needed to resolve issues with Microsoft servers in connection with his job with Chase.  (Ex. A at 35, 66-67).  Courts have found that such specialized computer certifications help demonstrate that an individual is an exempt computer professional.  See, e.g., Bagwell, 385 F.Supp.2d at 1319 & 1328 (finding plaintiff exempt under computer professional exemption based in part on plaintiff obtaining computer and networking certifications); Bobadilla v. MDRC, No. 03-civ-8217, 2005 WL 2044938, at *7 (S.D.N.Y. Aug. 24, 2005) (finding plaintiff exempt under computer professional exemption and noting that he held "valuable" computer certifications).

In addition to being a MCSA and MCP, Clarke's primary duties involved a combination of all of the duties required for satisfying the computer professional exemption.  First, Clarke consulted with users to determine hardware, software, or system functional specifications.  Indeed, whether he was creating Q-Tree or volume remediation plans or cluster failover plans, or identifying and resolving difficult or critical network server problems, Clarke needed to consult with users (often a whole LOB) to determine and diagnose the root cause of the problem, to determine the short-term and long-term needs of the LOB, to determine options for resolution, and to discuss with the LOB the impact of the plan for resolution.  (Ex. A at 119-20, 150-53, 190-95, 201, 204-05, 212; Ex. E at 190, 258-59; Ex. B ¶¶11, 15).  For example, in connection with capacity management and remediation, Clarke discussed the following issues with the LOB in connection with his creation of design plans to meet capacity needs:  the amount of data for storage, the size of the different folders in the Q-Tree and who had access to each folder, the manner in which its

data was backed up, whether it had specific archiving parameters, and the future needs of the LOB. (Ex. A at 194-95, 201, 204-05, 212). In addition, in connection with clustering, he discussed the impact of failover options with the LOB. (Ex. B ¶¶11,15). In connection with his work with Netbackup, he consulted with the LOBs to devise backup policies. (Ex. B ¶19; Ex. A at Dep. Ex. 31). Finally, in connection with the Atlanta IB project, he discussed the LOB's requirements for the project so that he could eventually engage in proper testing in connection with the project. (Ex. A at 277-79).

Second, Clarke designed computer systems based on and related to user or system design specifications. In terms of his responsibility for capacity management and Q-Tree and volume remediation, he helped design the architecture of the computer system by determining what storage devices should be used to store which data, how many storage devices should be used, what Q-Trees should be used to store what data, the best use of available volumes, what portions of the available volumes should be allocated to a given LOB, whether volumes should be expanded or migrated, how data should be expanded or migrated, all for the purpose of making sure the system works in the most efficient manner. (Ex. A at 158-60, 168-71, 174-75, 190-95, 201-05, 212, 215, 225-30, 290-91, Dep. Exs. 34, 40, 41, 42, 47; Ex. E at 309-11, 318-19). In connection with clustering, he designed the clustering infrastructure by determining how and when servers would failover. (Ex. B ¶¶10-11).

Third, Clarke documented computer systems and programs. Indeed, to assist his colleagues, Clarke prepared documentation regarding disaster recovery and the process for Share Synchronization of the NETAPP Filers. (Ex. A at 329-33, Dep Exs. 50, 51; Ex. F). He also prepared policies in connection with NetBackup. (Ex. A at Dep. Ex. 31).

Fourth, Clarke analyzed computer systems. Clarke analyzed the Chase's computer network to create capacity management plans and to analyze the risks and impact associated with the plans' implementation. (Ex. A at 158-60, 168-71, 174-75, 190-95, 201-05, 212, 215, 225-30, 290-91, Dep. Exs.

34, 40, 41, 42, 47; Ex. E at 309-11, 318-19).  When it came to solving high level Peregrine issues, Clarke analyzed the system to diagnose the root cause and to weigh options for resolution.  (Ex. A at 257-58, 284, 306).  Clarke also analyzed the system to identify underutilized servers and suggest their decommission.  (Ex. A at 343-44).  Finally, Clarke analyzed the system to devise failover plans and determine how to resolve clustering problems.  (Ex. B ¶¶10-11, 15).

Fifth, Clarke tested or modified computer systems or programs based on and related to user or system design specifications.  Clarke engaged in testing new computer systems and programs when he performed testing on IB's disaster recovery system and in connection with the Atlanta IB project.  (Ex. A at 269-70, 277-79).  In addition, Clarke modified the computer systems by installing patches on servers, and specifically, by maintaining the latest Microsoft Security patches throughout the global server infrastructure of 1200 servers.  (Ex. A at 232, Dep. Ex. 31).  In addition, he engaged in scripting to modify the computer system.  (Ex. A at 71, 337; Ex. F; Ex. E at 294-95).  He utilized these scripts to send data to new servers after he decommissioned a server.  (Ex. F).  He also wrote a script that "set up a process via the Alita tool to continuously synchronize the shares and a reporting tool that send[s] an email to our group that [they] check to ensure all production shares are replicating to the DR Filers."  (Ex. F).  Finally, he modified a script that enabled his team to automatically delete defect data and move aged data.  (Ex. E at 294-98).  Clarke also made the following configuration changes, among others, to the computer system:  (1) he configured and maintained MS Cluster Servers; (2) he configured and maintained the Veritas NetBackup Master Servers Media Servers and Client Servers; and (3) he configured Fiber and direct attached tape devices.  (Ex. A at Dep. Ex. 31).  By completing this work, he was customizing operating systems, software, and servers to meet user specifications, and he ensured that the servers communicated properly with one another and met the LOBs' needs to get the job done.  (Ex. B ¶18).

Because Clarke was a certified MCSA and MCP, was the SME for capacity management, fourth

level of escalation for clustering issues, and performed a combination of consulting with users, designing computer system infrastructure, configuring and maintaining servers, assisting in building out an entire facility, authoring computer system documentation, analyzing computer systems, and testing and modifying systems and programs, he qualifies as exempt under the computer exemption.  See, e.g., Bobadilla, 2005 WL 2044938, at *5, *8 (because plaintiff made decisions regarding how computer network should function and analyzed existing network resources, determined that underutilization existed, and implemented configurations which provided for network performance upgrade, he was exempt under computer exemption); Bagwell, 385 F.Supp.2d at 1327 (design, development, analysis of computer system, and consulting with users are exempt duties under computer exemption); Bergquist v. Fidelity Info. Servs., Inc., 399 F.Supp.2d 1320, 1331-32 (M.D.Fla. 2005) (designing plan, determining its technical specifications, implementing plan, and following up on plan all exempt duties under computer exemption).

### D.   Clarke Was Exempt Under The Combination Exemption.

Under the FLSA, employees who perform a combination of exempt duties for administrative and computer employees may qualify for exemption.  "In other words, work that is exempt under one section of this part will not defeat the exemption under any other section."  29 C.F.R. § 541.708.  For the reasons set forth above, there is no doubt that Clarke performed a combination of exempt duties under the administrative and computer exemptions while he worked at Chase.  (See supra at 13-24).  Thus, he also qualifies as exempt under the combination exemption.

VI.     **CONCLUSION**

For the reasons set forth above, Clarke's FLSA and NJWHL claims are time barred and should be dismissed.  But even if his FLSA claim for the short period of March 7, 2005 until August 1, 2005 is not time barred, Clarke was exempt under the FLSA throughout this time period.  Accordingly, the Court should dismiss both of his claims in their entirety.

Dated:  April 14, 2009
      New York, New York              By: /s/ Sam S. Shaulson
                                          Sam S. Shaulson (SS 0460)
                                          Debra Morway (DM 2629)
                                          MORGAN, LEWIS & BOCKIUS LLP
                                          101 Park Avenue
                                          New York, New York 10178
                                          (212) 309-6000

                                          Attorneys for Defendant