OUTTEN & GOLDEN LLP
Adam T. Klein (AK 3293)
Carmelyn Malalis (CM 3350)
Ossai Miazad (OM 1127)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000

ALTSHULER BERZON LLP
James M. Finberg (CA Bar# 114850, admitted *pro hac vice*)
Eve H. Cervantez (CA Bar # 164709, admitted *pro hac vice*)
Peter E. Leckman (CA Bar # 235721)
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151

LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
Kelly M. Dermody (CA Bar # 171716, admitted *pro hac vice*)
Jahan C. Sagafi (CA Bar # 224887, admitted *pro hac vice*)
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW CLARKE and TAPAS SARKAR, individually and on behalf of other similarly situated persons, | |
| Plaintiffs, | Case No. 1:08-cv-02400-CM |
| v. | |
| JP MORGAN CHASE & CO., | Hon. Colleen McMahon |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S SUMMARY JUDGMENT MOTION TO DISMISS CLAIMS OF PLAINTIFF CLARKE

## <u>TABLE OF CONENTS</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ..........................................................................................iii

INDEX OF EXHIBITS ................................................................................................ vii

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 2

        A.      Mr. Clarke's Job Duties Were Repetitive, Routine, and Guideded by the
                Directions and Protocols of Chase's Engineering Department........................... 2

                1.      Mr. Clarke Followed Strict Protocols To Ensure that No Disk Volume
                        Was Overloaded................................................................................. 2

                2.      Mr. Clarke Followed Strict Protocols to Ensure Printers Did Not Become
                        Overloaded......................................................................................... 5

                3.      Mr. Clarke's Other Duties Were Similarly Routine and Strictly
                        Controlled ......................................................................................... 6

                4.      Mr. Clarke Did Not Engage in Any Management Activities..................... 7

        B.      Mr. Clarke's Work Was Closely Monitored by Chase. .......................................... 7

III.    ARGUMENT ...................................................................................................... 8

        A.      Legal Standard ......................................................................................... 8

        B.      Clarke's FLSA Claims Are Not Time-Barred. .................................................. 10

        C.      Chase's Motion Must Fail Because It Has Already Admitted that Mr. Clarke Was
                Not Exempt from Overtime. ...................................................................... 10

        D.      Defendant Has Not Met Its Burden To Prove that Plaintiff Plainly and
                Unmistakably Qualifies for the Administrative Exemption. ............................... 12

                1.      Chase Has Not Produced Evidence Establishing that Plaintiff's Job
                        Duties Were Directly Related to Chase's Management or General
                        Business Operations......................................................................... 13

          2.      Chase Has Not Produced Evidence Establishing that Mr. Clarke Exercised Discretion and Independent Judgment with Respect to Matters of Significance............................................................................................... 17

    E.     Chase Has Not Met Its Burden To Prove That Mr. Clarke Unmistakably Qualifies for the Computer Exemption. ............................................................................... 20

    F.     Chase Has Not Met Its Burden To Prove That Mr. Clarke Unmistakably Falls Within the Combination Exemption ................................................................... 24

IV.    CONCLUSION................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.H. Phillips, Inc. v. Walling*,
  324 U.S. 490 (1945)........................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................8

*Arnold v. Ben Kanowsky, Inc.*,
  361 U.S. 388 (1960)........................................................................................9

*Bagwell v. Florida Broadband, LLC*,
  385 F. Supp. 2d 1316 (S.D. Fla. 2005) .................................................15, 22, 23

*Bergquist v. Fidelity Info. Servs., Inc.*,
  399 F. Supp. 2d 1320 (M.D. Fla. 2005)..............................................................20

*Bilyou v. Dutchess Beer Distributors, Inc.*,
  300 F.3d 217 (2nd Cir. 2002)..........................................................................9

*Bobadilla v. MDRC*,
  No. 03-Civ-9217, 2005 WL 2044938 (S.D.N.Y. Aug. 24, 2005)....................23, 24

*Bohn v. Park City Group, Inc.*,
  94 F.3d 1457 (10th Cir. 1996) .........................................................................24

*Bothell v. Phase Metrics, Inc.*,
  299 F.3d 1120 (9th Cir. 2002) ....................................................................12, 13

*Bratt v. County of Los Angeles*,
  912 F.2d 1066, 1070 (9th Cir. 1990) ................................................................13

*Brazos River Auth. v. GE Ionics, Inc.*,
  469 F.3d 416 (5th Cir. 2006) ...........................................................................11

*Burke v. County of
  Monroe*, 225 F. Supp. 2d 306 (W.D.N.Y. 2002) ...........................................18, 19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................8

*Chao v. Vidtape, Inc.*,
  196 F. Supp. 2d 281 (E.D.N.Y. 2002) ...............................................................10

*Coach Leatherware Co. v. AnnTaylor, Inc.,*
    933 F.2d 162 (2d Cir. 1991)................................................................8

*Combs v. Skyriver Commc'ns., Inc.,*
    159 Cal. App. 4th 1242 (2008) .........................................................15

*Cooke v. Gen. Dynamics Corp.,*
    993 F. Supp. 56 (D. Conn. 1997).......................................................17

*Dalheim v. KDFW-TV,*
    918 F.2d 1220 (5th Cir. 1990) ..........................................................24

*Damassia v. Duane Reade, Inc.,*
    250 F.R.D. 152 (S.D.N.Y. 2008) ......................................................12

*Desmond v. PNGI Charles Town Gaming,*
    564 F.3d 688 (4th Cir. 2009) ............................................................16

*Dole v. Malcolm Pirnie, Inc.,*
    758 F. Supp. 899 (S.D.N.Y. 1991).......................................................9

*El v. SEPTA,*
    479 F.3d 232 (3d Cir. 2007)...............................................................9

*Heffelfinger v. EDS Corp.,*
    580 F. Supp. 2d 933 (C.D. Cal. 2008) ..............................................15

*Jackson v. McKesson Health Solutions LLC,*
    No. 03-11177, 2004 WL 2453000 (D. Mass. Oct. 29, 2004) ................19

*Lutz v. Ameritech Corp.,*
    208 F.3d 214, 2000 WL 245485 (6th Cir. 2000) ...................................15

*Malloy v. Richard Fleischman & Assocs. Inc.,*
    No. 09-322, 2009 WL 1585979 (S.D.N.Y. June 3, 2009) ........................1

*Martin v. Ind. Mich. Power Co.,*
    381 F.3d 574 (6th Cir. 2004) .................................................... passim

*Martin v. Malcolm Pirnie, Inc.,*
    949 F.2d 611 (2d Cir. 1991)................................................................9

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988).........................................................................10

*Patterson v. County of Oneida,*
    375 F.3d 206 (2d Cir. 2004)................................................................8

*Prentiss & Carlisle Co. v. Koehring-Waterous Div. of Timberjack, Inc.*,
   972 F.2d 6 (1st Cir. 1992) ..........................................................................11

*Reich v. New York*,
   3 F.3d 581 (2d Cir. 1993) ...........................................................................13

*Roberts v. Ground Handling, Inc.*,
   499 F. Supp. 2d 340 (S.D.N.Y. 2007) ........................................................14

*Rocky Mountain Helicopters v. Bell Helicopters Textron*,
   805 F.2d 907 (10th Cir. 1986) ....................................................................11

*Ruggeri v. Boehringer Ingelheim Pharm., Inc.*,
   585 F. Supp. 2d 254 (D. Conn. 2008) .........................................................17

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985).......................................................................................9

*Turner v. Human Genome Scis., Inc.*,
   292 F. Supp. 2d 738 (D. Md. 2003) .............................................2, 13, 19, 20

*Westmoreland v. CBS, Inc.*,
   601 F. Supp. 66 (S.D.N.Y. 1984)................................................................11

*Yang v. ACBL Corp.*,
   427 F. Supp. 2d 327 (S.D.N.Y. 2005) .........................................................10

## STATUTES

29 U.S.C. §213(a)(17)...........................................................................20, 24

29 U.S.C. §213(a)(17(A) ................................................................................22

29 U.S.C. § 255(a) .........................................................................................10

29 U.S.C. § 213 ................................................................................................1

N.J. Stat. Ann. § 34:11-56a25.1 ...................................................................10

## OTHER AUTHORITIES

29 C.F.R. § 541.200(a).................................................................................12

29 C.F.R. §541.200(a)(3) ..............................................................................17

29 C.F.R. §541.201(a)...................................................................................13

29 C.F.R. §541.201(b)...................................................................................13

29 C.F.R. § 541.202(a)............................................................................................17, 18

29 C.F.R. §541.202(b) ................................................................................................ 17

29 C.F.R. §541.202(e)................................................................................................. 17

29 C.F.R. §541.202(f) .................................................................................................16

29 C.F.R. §541.400.....................................................................................................20

29 C.F.R. §541.400(b) ................................................................................................20

29 C.F.R. §541.401.....................................................................................................20

29 C.F.R. §541.402.....................................................................................................14

29 C.F.R. §541.700(a).................................................................................................12

29 C.F.R. § 779.101 ......................................................................................................9

69 Fed. Reg. 22122 (2004) ...................................................................................12, 13

2 Weinstein, et al., Federal Evidence § 407.06[1] (2d ed. 1997)..................................11

FED. R. CIV. P. 56(c) .....................................................................................................8

## DOL WAGE & HOUR OPINION LETTERS

DOL Wage & Hour Op. Ltr., 1999 WL 1788144 (Aug. 19, 1999) .................................14, 21, 22

DOL Wage & Hour Op. Ltr., 2001 WL 1558967................................................18, 21

DOL Wage & Hour Op. Ltr., 2006 WL 3406603 (Oct. 26, 2006) ...................16, 18, 21

DOL Wage and Hour Op. Ltr., 2001 WL 1558967 (May 11, 2001) ...............................1

DOL Wage & Hour Op. Ltr., 1999 WL 33210907 (Nov. 5, 1999) ..............................21

**INDEX OF EXHBITS**

**(With Page Cites To Plaintiffs' Memorandum of Law In Opposition to Defendant's Summary Judgment Motion to Dismiss Claims of Plaintiff Andrew Clarke)**

**Exhibit A** ..........................................................................................................1, 10, 11

**Exhibit B** .................................................................................................................1, 11

**Exhibit C**..............................................................................................................1, 11, 12

**Exhibit D** ............................................................................................................... passim

**Exhibit E** .....................................................................................................................4, 7

**Exhibit F** ..................................................................................................................... 11

I.      **INTRODUCTION**

In the summer of 2005, after a "comprehensive review of the job content," Defendant JP Morgan Chase & Co. ("Chase") concluded that it had to reclassify certain employees as non-exempt, that is, entitled to overtime, in order to comply with the Fair Labor Standards Act ("FLSA").  Declaration of Adam T. Klein, Esq., in Opposition to Defendant's Motion for Summary Judgment on the Claims of Andrew Clarke ("Klein Decl."), Ex. A (JPMC 0009485-87).  Chase reached this conclusion because its review revealed, "the majority of work performed under these titles is troubleshooting, installation and problem resolution [,which] is often considered to be nonexempt in nature."  *Id*. at JPMC 0009486.  Chase informed those affected that "[t]here are <u>no changes in job responsibilities</u> because of this reclassification."  Klein Decl., Ex. B (JPMC 0009469-74) (emphasis in original).  One of the employees whose exemption status changed was plaintiff Andrew Clarke.  Klein Decl., Ex. C (JPMC 0009475-9477).  In view of Chase's *own* conclusion that Mr. Clarke had been *improperly* classified as exempt, which it reached after a comprehensive review of Mr. Clarke's "job content," Klein Decl., Ex. A, Chase cannot now establish the exact opposite conclusion – that Mr. Clarke was *correctly* classified as exempt – as a matter of undisputed fact.

Furthermore, Chase's arguments that Mr. Clarke falls within the administrative exemption, computer professional exemption, or the combination exemption are incorrect.  Mr. Clarke performed routine printing and data storage maintenance, aided by his technical expertise, all in accordance with Chase and industry procedures and protocols.  Federal and state authorities are clear that such workers do not fall within any exemption to overtime pay requirements.  As this Court recently held, the position of the "Department of Labor [is] that such persons are or may be non-exempt employees who are subject to the wages and hours laws set forth in the Fair Labor Standards Act, 29 U.S.C. § 213."  *Malloy v. Richard Fleischman & Assocs. Inc.*, No. 09-322, 2009 WL 1585979, at *1 (S.D.N.Y. June 3, 2009); *see also, e.g.*, DOL Wage and Hour Op. Ltr., 2001 WL 1558967 (May 11, 2001) (employees who "analyz[e] current equipment and software, identify[] equipment and software needs, determin[e] scope of work for

1

implementation and integration of old with the new, and continu[e] with support of hardware and software after the implementation is complete" do not fall within any exemption because they do not "design, create or modify the systems or programs."); *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 582 (6th Cir. 2004) (technical computer employee whose job was "to assist in keeping the computers and network running to the specifications and designs of others" does not fall within any exemption); *Turner v. Human Genome Scis., Inc.*, 292 F. Supp. 2d 738 (D. Md. 2003) (same). At a minimum, there are triable issues of fact regarding whether Mr. Clarke was properly classified as an exempt employee, particularly given the conflicting deposition and declaration testimony about his job duties. *See* Plaintiffs' Response to Defendant's Statement of Material Facts filed herewith.

## II.    BACKGROUND

### A.    Mr. Clarke's Job Duties Were Repetitive, Routine, and Guided by the Directions and Protocols of Chase's Engineering Department.

Mr. Clarke worked in Chase's "Global Technology Infrastructure" department to help Chase employees with their printing and file-saving needs. Klein Decl., Ex. D (Andrew Clarke Deposition Excerpts) at 114:23-24; Declaration of Andrew Clarke ("Clarke Decl.") ¶ 7. When Chase's attorneys asked him to describe what he did while he worked at Chase, Mr. Clarke testified that "I do troubleshooting . . . [i]f there is a server down or workstation down, I would try to resolve the issue." Klein Decl., Ex. D, at 16:2-5.

#### 1.    Mr. Clarke Followed Strict Protocols To Ensure that No Disk Volume Was Overloaded.

Most of Mr. Clarke's time was spent troubleshooting file saving and space issues. Klein Decl., Ex. D, at 274:22-24; Clarke Decl. ¶ 7. By using technical jargon, Chase attempts to recast Clarke's "remediation" duties as something more than they were. In truth, as Mr. Clarke testified, his Q-Tree remediation work basically meant looking to see which disk volumes were getting full, and then either deleting old or defective data or moving data to a volume that was less full. Klein Decl., Ex. D, at 149:4-19. As Mr. Clarke explained:

> [I]f [a] volume was running out of space there was a couple of standards and procedures that was put in place[.]  [We would use an] application called file census.  Now [using] this application you had two options . . . basically you could remediate the volume by moving aged data which was data [that] hasn't been accessed in maybe two years. . . Or you had defect files which were, you know, music files, temp files, maybe some movie files and you know you would use an application to . . . delete all those.

*Id.*

Chase urged Mr. Clarke to testify that he made "recommendations" to the lines of business when he engaged in this "review-move-delete" capacity management.  Mr. Clarke did not think that was the proper descriptor for what he did: "I guess I am having a problem with the wording….I would provide them information about the problem," i.e., which volumes were full and what types of files each volume contained.  Klein Decl., Ex. D, at 154:4-8; *see also Id.* at 157:13-17 ("Q. Wasn't it part of your job to explore these options, lay them out and make recommendations?  A. That sounds more like an engineering standpoint."); *see also Id.* at 225:23-25 (testifying that although he used the word "analyze" in his performance review, "[y]ou know, that's the word [analyze] I used, but it is more for information gathering.").

Clarke's "recommendations" were not, as Chase contends, evidence of independence and discretion.  First, Mr. Clarke explained that a significant portion of his work involved implementing existing protocols to move data based on the software application, "File Census," which would explain the characteristics of each volume.  "So you take a look at [File Census] and see what are the largest folders and you would try to pick those out to move them, to migrate them to somewhere else." Klein Decl., Ex. D, at 194:19-24.  Second, Mr. Clarke testified that "industry standards" dictated his capacity management work. *Id.* at 160:18; *see also Id.* at 303:5-6 (testifying that his work did not involve significant discretion because "your skills and knowledge come from the manual.").  As Mr. Clarke explained, the system's inherent limitations and the basic instruction to move data according to established guidelines left him with no meaningful discretion:

> [T]hese systems are designed a certain way.  And basically these options are industry standards.  There is just certain ways you can go because of the way -

> - how the system is designed.  I can't just make up an option out of thin air and
> just start saying, okay, we have to do this, we have to do that. . . .[t]o me
> really there is only certain ways you can go, the way the system is designed.
> You can't just figure something out without -- I don't have that type of
> expertise to figure something out that has not been thought of already….

Klein Decl., Ex. D, at 292:16-23, 293:20-25.

  Just as the software he used and the industry protocols he followed circumscribed his

discretion, Chase management circumscribed Mr. Clarke's independence.  Mr. Clarke, himself,

would generally not decide what action to take as a result of this information.  *See* Klein Decl.,

Ex. D, at 297:25-298:1 (testifying that "Q-Tree remediations were always discussed" with the

lines of business and his managers); *Id.* at 286:20-21 (testifying that his job was "very reactive").

Once Mr. Clarke provided the information, "at that point the ultimate decision is really up to

them which way they really want to go."  Klein Decl., Ex. D, at 196:7-9; *see also* Clarke Decl. ¶

13 ("I had no authority to implement remediation plans on my own.  Remediation plans could

not be implemented unless they were approved by the line of business, my direct supervisor

(Mark Grom) and his manager.").

  Moreover, the line of business or Chase's Engineering Department would have to agree

with Mr. Clarke's recommendations, and would tell him what type of data he could delete.  Klein

Decl., Ex. D, at 149:4-152:2.  Indeed, Mr. Clarke's manager testified that he would ask

individuals with Chases lines of business, who had no technical expertise, if they agreed with Mr.

Clarke's recommendations.  Klein Decl., Ex. E, at 317:9-12 ("Q. So you're asking Mike, who is

a business person, if he agrees with Andrew's recommendation; is that correct?  A. That's

correct.").

  In short, as a member of an Operations Team, Mr. Clarke's role was to maintain the

systems according to external constraints, whether set by the inherent limitations of the systems,

by management, by the client or by the engineering team.   That left him with no meaningful

independence.  As Mr. Clarke explained at his deposition when Chase urged him to testify that

he acted independently, "[w]ell, when you say think independently, I would more link that to someone in engineering team."  Klein Decl., Ex. D, at 255:15-256:3.

        **2.**      **Mr. Clarke Followed Strict Protocols to Ensure Printers Did Not Become Overloaded.**

Print load balancing simply means that Mr. Clarke would monitor printer settings and connections confirm configurations, and make sure that Chase's printing requests were headed to the various printers, so as not to overload any one printer.  Klein Decl., Ex. D, at 142:15-22 ("You would create printers.  You would assign the correct drivers to the printer.  You would make sure that each driver that was loaded onto one server was on the second server in case of failover.")  Mr. Clarke explained that he would install software updates for the printers based on alerts from software vendors and engineering instructions.  *Id*.  This work was repetitive and routine.  *See* Clarke Decl. ¶ 16 (describing print load balancing as making sure no one server was overloaded with printers and explaining that the "process for moving queues between servers was relatively simple and we routinely had to perform that type of work.").

Contrary to Chase's characterization, Mr. Clarke did not consider himself a "subject matter expert" when it came to print load balancing.  Klein Decl., Ex. D, at 137:5-6 ("definitely not consider myself a subject matter expert.").  As Mr. Clarke explained, while Chase may have labeled him as an expert, "it doesn't mean that what they put on there makes me a subject matter expert."  *Id*. at 137:23-25; *see also* Clarke Decl. ¶ 25 ("All of the workers on my team were designated as SMEs by Chase in their assigned areas.  My understanding was that Chase was designating us as SMEs for internal use only.  It was just a fancy sounding term to make us feel good and probably more importantly to make the lines of business feel comfortable that we knew how to support and fix their computer systems.").  To the extent that Mr. Clarke was an expert, moreover, that simply meant he was familiar with the machinery, not that he exercised independence or discretion.

### 3.   Mr. Clarke's Other Duties Were Similarly Routine and Strictly Controlled.

Mr. Clarke also provided low-level troubleshooting and support in other areas.[1]

Chase makes much of the fact that Mr. Clarke drafted a document about disaster recovery. Def. Mem. at 10.  But Mr. Clarke testified that his manager told him to draft the document, Klein Decl., Ex. D, at 333:2, and that the document was simply a summary of information given to him from Chase's Engineering Department.  *See* Clarke Decl. ¶ 23 ("Chase's Engineering Team created . . . a disaster recovery plan, which contained instructions for all of Chase's technology teams, including mine.  Because the document was extremely long and not focused on one technology group, I pulled out the File and Print section to create a separate document for my team.  I did not draft or create any of the instructions.  I just copied and pasted what I got from Engineering.").   Summarizing instructions handed down from engineering did no constitute the exercise of independence or discretion.

Likewise, Chase overstates Mr. Clarke's scripting work.  Scripting can take many forms, but in Mr. Clarke's case, it amounted to "simple inputs for another program, which allow multiple files to be copied."  Clarke Decl. ¶ 20.  As Mr. Clarke testified, he drafted "some" scripts, but they were all "[t]iny."  Klein Decl., Ex. D, at 335:22.  Scripting was not one of Mr. Clarke's primary duties.  Clarke Decl. ¶ 20.  As Mr. Clarke explains in his declaration, "My knowledge of scripting was limited and as a result I never performed any complex scripting tasks."  *Id*.[2]

---

[1] *See* Clarke Decl. ¶¶ 14-17 ("I also worked on cluster configuration, which means changing the configurations (settings) of servers and applications to the requested specifications of Engineering . . .. I tended to do relatively simple configurations.  When I had a cluster configuration that I could not complete without more information, I asked a team member who knew the Engineering standard better than I did, or I just asked Engineering for the procedure myself."); *id*. at ¶ 18 ("In addition to disk remediation work and cluster configuration, I installed, maintained, and configured NetBackup software.  NetBackup enables data on servers to be backed up regularly.  I relied on detailed documentation and instructions about NetBackup, which I received from Engineering….").

[2] Unsurprisingly, Chase does not discuss Mr. Clarke's routine and low-level work.  For example, Mr. Clarke testified that he would sometimes engage in inventories of individual's

### 4.      Mr. Clarke Did Not Engage in Any Management Activities.

Mr. Clarke did not hire, fire, supervise, evaluate, or discipline other employees.  Clarke Decl. ¶ 29.   Mr. Clarke also did not develop, design, price, sell, or market Chase's services or products.  Clarke Decl. ¶ 31.  He did not negotiate contracts or transactions.  *Id.*  Mr. Clarke did not create or establish business operational or management polices for Chase or any of its customers.  *Id.*  Mr. Clarke also did not make decisions regarding what type of software or hardware to purchase or implement.  *Id.*  He did not design computer systems or software.  *Id.* He did not even have authority to shut down network systems.  *Id.*

### B.      Mr. Clarke's Work Was Closely Monitored by Chase.

Mr. Clarke repeatedly testified that Chase management directed his activities and monitored his work.   When asked who decided what he would do each day, Mr. Clarke testified he was told what to do by his manager.  Klein Decl., Ex. D, at 279:20.   Mr. Clarke explained that he communicated with his manager daily.  *Id.* at 339:16-18.   "He would dictate certain things, yes.  But if he didn't dictate that da[y], it would be what was put in place for you to do in that order." *Id.* at 348:19-22.  Mr. Clarke's manager himself testified that he would keep an eye on Mr. Clarke and the others he managed through "[e]-mails, FYI, updates from particular people, technicians and the business, where I would ask questions, you know, depending upon the severity of the project or whatever it is they're working on, you know, you would just interact with them, making sure that you understand . . . what they're doing…." Klein Decl., Ex. E (Mark Grom Deposition Excerpts) at 51:18-25; *see also Id.* at 271:7-9 ("it was their job to inform me of what their status was").

Mr. Clarke also testified that he did not have flexibility to solve problems on his own and that "each issue would have to be discussed."  Klein Decl., Ex. D, at 296:17-18.  If Mr. Clarke

_____

(continued…)

desktops, which "is easy, you go to the desktop and look at what applications they have…."
Klein Decl., Ex. D, at 323:24-324:2.

confronted a problem that was not routine, he testified that "of course I have to get my manager involved." *Id.* at 297:10-11.  Moreover, once the line of business decided what to do, Mr. Clarke would have to get the approval of all affected users through Chase's change control process. *Id.* at 215:20-21 ("You have to get approval before you could go ahead and do the work.").

An exempt employee from Chase's Engineering Department confirms that operations employees, like Mr. Clarke, were instructed to follow strict guidelines from his department.  *See* Declaration of Lap Wang "Frank" Kwan ("Kwan Decl.") ¶ 13 ("In a complicated and huge environment like ours, it was critical that decisions of importance be centralized in a high-level group like the Engineering Team, so that the Operations people have clear direction and minimal opportunity to deviate from our guidelines, standards, and policies.").  As Mr. Kwan explained, Chase's Engineering Department provided "the appropriate direction based on what [they] in Engineering wanted the Production Team to do."  Kwan Decl. ¶ 19.

Mr. Clarke worked many hours of overtime for which he was not compensated.   Clarke Decl. ¶ 4.

## III.   ARGUMENT

### A.   Legal Standard

Chase must clear a particularly high hurdle on its summary judgment motion.  Because Chase is the moving party, the Court must accept Plaintiffs' version of the facts and draw all reasonable inferences from those facts in Plaintiffs' favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).  The Court may only grant Chase's motion if "there is no genuine issue as to any material fact" and Chase is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Only if "no reasonable [factfinder] could return a verdict for the [Plaintiffs]," can Chase prevail.  *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).  Here, as shown above and in Plaintiffs' Response to Defendant's Statement of Material Facts, there is a wealth of disputed facts concerning, *inter alia*, Mr. Clarke's job

duties, the level of discretion and independent judgment afforded him, his "management" of other employees, and the level of control and supervision Chase exercised over him.

The familiar summary judgment standard holds added significance on this motion because Chase also bears the ultimate burden of proof at trial; the exemptions are affirmative defenses to be proved by the employer. *See, e.g.*, *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2nd Cir. 2002). Chase must show that the record contains evidence satisfying its burden and that the evidence is so powerful that no reasonable fact-finder would be free to disregard it. *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

In addition to facing the usual summary judgment standard and the added obstacle of proving each element of its affirmative defense, Chase must also overcome the principle that FLSA exemptions are "narrowly construed against the employers seeking to assert them and their application limited to those establishments *plainly and unmistakably* within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960) (emphasis added). As a result, courts require FLSA defendants to prove exemptions by "clear and affirmative evidence," *Dole v. Malcolm Pirnie, Inc*., 758 F. Supp. 899, 902 n.3 (S.D.N.Y. 1991) (quoting *Donovan v. United Video, Inc*., 725 F.2d 577, 581 (10th Cir. 1984)), *rev'd on other grounds sub nom. Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2d Cir. 1991), and require those defendants to show that they "plainly and unmistakably" meet each element of the exemption they assert. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Bilyou*, 300 F.3d at 222. This Chase cannot do.[3]

---

[3] "Congress intended the [FLSA] to be broad in its scope." 29 C.F.R. § 779.101. Courts construe the FLSA "liberally to apply the furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (internal quotation marks omitted).

9

**B.      Clarke's FLSA Claims Are Not Time-Barred.**

The statute of limitations under the FLSA is ordinarily two years, but it may be extended

to three years if the claim arises from a "willful" violation.  29 U.S.C. § 255(a).  The willfulness

requirement may be satisfied if the employer either acted knowingly or "showed reckless

disregard for the matter of whether its conduct was prohibited by the statute."  *McLaughlin v.*

*Richland Shoe Co.,* 486 U.S. 128, 133 (1988).  That Chase itself found that Mr. Clarke was

entitled to overtime, but then refused to pay him backpay for the hours he worked while he was

misclassified suggests strongly that it acted knowingly in denying him the overtime pay he was,

and still is, due.  *Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 337-38 (S.D.N.Y. 2005) (employer

knew he was required to pay employees overtime for hours worked in excess of 40 per week);

*Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 295-96 (E.D.N.Y. 2002) (defendants had knowledge

of minimum wage and overtime laws and posted a sign in the break room notifying employees

about their rights under the FLSA).  Indeed, Chase has not even attempted to meet its burden of

proving, on undisputed facts, that its refusal to pay Mr. Clarke for the overtime hours he worked

prior to reclassification was not willful.  Accordingly, Mr. Clarke's FLSA claims are timely for

the period from March 7, 2005 (three years before filing the complaint) through the time he was

reclassified in August 2005.[4]

**C.      Chase's Motion Must Fail Because It Has Already Admitted that Mr. Clarke Was Not Exempt from Overtime.**

In the summer of 2005, Chase recognized that it had misclassified Mr. Clarke as being

exempt from overtime.  Klein Decl., Ex. A.  Accordingly, Chase reclassified him as nonexempt,

---

[4] Plaintiffs concede that Clarke's individual New Jersey overtime claims are time-barred, because he did not file this action within New Jersey's two-year statute of limitations.  *See* N.J. Stat. Ann. § 34:11-56a25.1.  Mr. Clarke also worked in Long Island, New York, from approximately June 2003 to July 2004, well within New York's six-year statute of limitations. *See* Clarke Decl. ¶ 3.  Accordingly, Mr. Clarke falls within "The New York Rule 23 Class," as defined by paragraph 30 of the complaint.

or overtime eligible.  Klein Decl., Ex. C (JPMC 0009475-9477).  Now, in its motion for summary judgment, Chase takes the opposite position and contends that Mr. Clarke has never been entitled to overtime.  Chase's reclassification decision was correct.  Mr. Clarke should receive backpay for the period when he was misclassified.  At a minimum, Chase's reclassification decision shows that Mr. Clarke's exempt status is a material fact in dispute.[5]

Chase periodically reviews the exempt status of its employees.  Klein Decl., Ex. F (JPMC 0005059-5061) at ¶ 2 ("As a normal practice, we periodically review our jobs to ensure we have them classified consistently.").  In 2005, Chase engaged in a "firm wide" examination of employees' exemption status.  Klein Decl., Ex. B at JPMC 0009469.  This review was "[b]ased on a comprehensive review of job content . . . " Klein Decl., Ex. A at JPMC 0009486.  From this review, Chase discovered that "the majority of work performed under these titles [including Mr. Clarke's title] is troubleshooting, installation and problem resolution [,which] is often considered to be nonexempt in nature." *Id*.

_____

[5] Chase's comprehensive review of the job responsibilities of proposed collective action members and its conclusion that they were misclassified was not a subsequent remedial measure. The payment of overtime to those workers prospectively was the subsequent remedial measure. (Chase failed to take full remedial measures, because it failed to pay back pay even though it determined that these workers were misclassified.)  Courts differentiate between post-event investigations and the remedy itself.  "The fact that the analysis may often result in remedial measures being taken . . . does not mean that evidence of the analysis may not be admitted." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 430 (5th Cir. 2006) (discussing post-accident investigations and citing other courts applying the same rule) (citations omitted); *see also Prentiss & Carlisle Co. v. Koehring-Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir. 1992) (post-event reports, with remedial measures redacted, are not subsequent remedial measures); *Rocky Mountain Helicopters v. Bell Helicopters Textron*, 805 F.2d 907, 918 (10th Cir. 1986) (holding Rule 407 only bars the actual remedial measure, not initial steps toward ascertaining whether any measure is necessary).  Post-event investigations do not make the event "less likely to occur," as required by the rule; only the actual implemented changes have this effect.  *Brazos River Auth.*, 469 F.3d at 430 n.10 (citing 2 WEINSTEIN, ET AL., FEDERAL EVIDENCE § 407.06[1] (2d ed. 1997) ("It is only if changes are implemented as a result of the tests that the goal [of 407] is furthered; and even then, it is only evidence of those changes that is precluded by the rule.")); *see also Westmoreland v. CBS, Inc.*, 601 F. Supp. 66, 67-68 (S.D.N.Y. 1984) (rejecting policy arguments for shielding investigative reports).  In this case, Chase conducted a "comprehensive review of job content."  Klein Decl., Ex. A.  This is exactly the sort of investigative report that Rule 407 does not exclude.

One of the employees affected by Chase reclassification was Mr. Clarke.  *See* Klein Decl., Ex. C.  Chase's conclusion that Clarke was entitled to overtime precludes it from establishing that Mr. Clarke *plainly and unmistakably* fell within any of the FLSA's exemptions as a matter of undisputed fact.  If Chase itself could review Mr. Clarke's duties and find that the law entitled him to overtime pay, so could a jury.

> **D.      Defendant Has Not Met Its Burden To Prove that Plaintiff Plainly and Unmistakably Qualifies for the Administrative Exemption.**

To meet its burden under the administrative exemption defense, Chase must prove:  1) that plaintiff's "primary duty is the performance of office or non-manual work directly related to management or general business operations of the employer or the employer's customers;" and 2) that this primary duty includes "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 155 (S.D.N.Y. 2008); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir. 2002).  Chase bears the burden of proving, plainly and unmistakably, that plaintiff meets *both* of these criteria, with the determination based upon plaintiff's "primary duty", *i.e.,* "the principal, main, major or most important duty that the employee performs" as determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. §541.700(a); *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Computer and Outside Sales Employees, Final Rule*, 69 Fed. Reg. 22122, 22139 (2004) (the regulation "contains two independent, yet related, requirements for the administrative exemption.").  An employer's failure to carry its burdens as to *either* requirement mandates denial of its motion.  *Bothell*, 299 F.3d at 1125 (criteria are "absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protections of the Act.") (quotation marks and citation omitted).

      **1.**      **Chase Has Not Produced Evidence Establishing that Plaintiff's Job Duties Were Directly Related to Chase's Management or General Business Operations**

To satisfy the "directly related" prong of the administrative exemption, Chase must prove that Mr. Clarke performed work "directly related to assisting with the running or servicing of the business." 29 C.F.R. §541.201(a). This requirement "is met if the employee 'engages in running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business's affairs." *Bothell*, 299 F.3d at 1125 (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)); *Reich v. New York*, 3 F.3d 581, 587 (2d Cir. 1993), *overruled by implication on other grounds by Seminole Tribe v. Florida,* 517 U.S. 44, 59-66 (1996). In its comments accompanying the 2004 regulations, the Department of Labor expressly affirmed the continuing vitality of *Bothell* and emphasized that the new regulations make "no changes to current law." 69 Fed. Reg. at 22146.

Courts throughout the country have recognized that the day-to-day, mechanical work of installing and maintaining computers and computer systems, such as that performed by Mr. Clarke, does not constitute "running the business itself or determining its overall course or policies," required by the administrative exemption's first prong. *Bothell,* 299 F.3d at 1125 (quotation marks and citation omitted); *see also Martin*, 381 F.3d at 581-83 (technical computer employee whose job was "to assist in keeping the computers and network running to the specifications and designs of others" was not engaged in work "relate[d] to the administrative operations" of the business); *Turner*, 292 F. Supp. 2d at 742-45 (technical computer employees with primary duties of troubleshooting hardware, software, and network connectivity issues "were simply the technicians who keep the company's overall computer and technological systems operating"; "[m]aintaining a computerized business is, in this day, part of every company's day-to-day operations" and "not work related to the administrative operations").

Although the administrative exemption regulations state that work meeting the "directly related" test may include certain "computer network, internet and database administration," 29 C.F.R. §541.201(b) (which work is not described in the regulation), any "administration" work

performed by the Mr. Clarke is at too low a level to meet this standard.  There may be computer employees who meet this standard because their <u>primary duties</u> involves high-level functions such as determining, planning or designing what kind of network, internet or database functions the business should have, or in setting or affecting policies and standards for the system's use and ongoing development.  But Mr. Clarke, a technical support worker with no involvement in the design or development of computer systems, is not such an employee.  *See* 29 C.F.R. §541.402 (computer employees who may be performing exempt "administrative work" include "systems analysts and computer programmers . . . if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer or the employer's customers").

The Department of Labor has concluded that employees who do not determine system functional specification or design, create, test, or modify computer systems or programs, and who instead simply manipulate and modify software settings and specifications to fit and respond to customer needs, install, debug, troubleshoot, and convert data from old systems to new (among other tasks), do not satisfy the first prong of the administrative exemption.  DOL Wage & Hour Op. Ltr., 1999 WL 1788144 (Aug. 19, 1999).[6]  They, like Mr. Clarke, "perform technical tasks, which do not constitute making or implementing policy, or the performance of management functions, necessary for the application of the exemption."  *Id.*

Each of the cases cited by Chase – which include an *unpublished transcript* of a hearing in another case, an *unpublished* decision from the Sixth Circuit, and a California *state* court decision – described employees whose primary duties differed significantly from those of Mr. Clarke.  The one published federal decision that Chase relies upon articulates well the relevant

---

[6] Department of Labor opinion letters are normally accorded great deference.  *See Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 353 (S.D.N.Y. 2007) ("Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing [the statute at issue], are at least '"a body of experience and informed judgment to which courts and litigants may properly resort for guidance[.]"'") (quoting *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 47 & n.1 (2d Cir. 2002).

standard in the computer context:  "The employees . . . who were explicitly charged with developing and administering computer systems, fell within the administrative exemption.  By contrast, the employees . . . who were tasked only with *installing and troubleshooting* computer systems, were not exempt."  *Heffelfinger v. EDS Corp*., 580 F. Supp. 2d 933, 962 (C.D. Cal. 2008) (emphasis added).  The court found that the plaintiffs in that case fell within the exemption because it was undisputed that the employees were charged with writing code, programming, and administering databases.  *Id*. at 961.  Mr. Clarke did none of these things.

Defendant's remaining authority is also inapposite.  Employees in Chase's cases did more than just the installing, maintaining, and troubleshooting performed by Mr. Clarke.  Rather, they had the additional and significant primary duties of "designing and overseeing a plan to provide [defendant] access to the intra-office computer network" (*Lutz v. Ameritech Corp*., 208 F.3d 214, 2000 WL 245485, at *2 (6th Cir. 2000)); "designed and integrated current and future network infrastructure for the entire organization . . . for a 400-person engineering group who then supported other groups" (*Millan v. Citigroup*, Civ. A. No. 07-cv-3769 (AKH), at 17-18)[7]; "maintaining, developing and improving [defendant's] network, . . . high-level problem solving, . . . capacity and expansion planning, planning for the integration of acquired networks . . ., lease negotiations, and equipment sourcing and purchasing" (*Combs v. Skyriver Commc'ns., Inc*., 159 Cal. App. 4th 1242, 1264 (2008); "it is undisputed that class members engaged in programming, design, and administration of their customers' databases" (*Heffelfinger*, 580 F. Supp. 2d at 961).  These programming and design activities are the type of "work activities relating to the administrative operations of a business."[8]

---

[7] In its moving brief, Chase cites to the unpublished argument transcript in *Millan*, which is improper and misleading for a number of reasons, including that the transcript does not lay out all of the relevant facts as would a published opinion. *See* Affidavit of Debra Morway in Support of Defendant's Motion For Summary Judgment on the Claims of Andrew Clarke, Ex. I.

[8] Moreover *Combs* and *Bagwell v. Florida Broadband, LLC*, 385 F. Supp. 2d 1316 (S.D. Fla. 2005), on which Chase relies, were decided after a full trial, not on summary judgment.

In stark contrast, Mr. Clarke had no role in the design or development of any network or computer systems for Chase or its clients.  He did not write code or engage in any programming.  Clarke Decl. ¶ 10.  He followed Engineer's instructions and protocols to do daily support and maintenance and break/fix type work with a focus on printers and disk drive space.  *Id.* ¶¶ 7, 21-23.  Chase has presented no evidence that his two "special projects" differed in any material way (nor were these two limited special projects his "primary duty").

Chase's Engineering Department (which is not included within the plaintiff class) was responsible for the actual design and development of computer systems and networks, and the instructions Mr. Clarke was required to follow.  *See* Kwan Decl. ¶¶ 5-15 (a Chase Engineer, describing the differences between the Engineering and Operations Departments ("As a rule, the Operations Team members' role was not to come up with new ideas or make decisions, but simply to implement what we gave them and to perform troubleshooting of problems.").

Finally, that a job is important to a company is not a basis for finding that his or her work is directly related to its general business operations.  As the Fourth Circuit recently held:

> [T]he indispensability of an employee's position within the business cannot be the *ratio decidendi* for determining whether the position is directly related to the employer's general business operations. . . .  Both the FLSA and its regulations make clear that an employee is exempt based on the *type* of work performed by that individual . . . .

*Desmond v. PNGI Charles Town Gaming*, 564 F.3d 688, 692-93 (4th Cir. 2009).[9]  At a minimum, whether Mr. Clarke's primary duty included developing and administering computer systems, as opposed to installing, maintaining, and troubleshooting them is a disputed issue of triable fact that cannot be resolved at summary judgment.

---

[9] "The fact that work may be unusually complex or highly specialized along technical lines, or that significant consequences or losses may result from improper performance of an employee's duties, do not automatically qualify the work as being significant to the management or general business operations of an employer."  DOL Wage & Hour Op. Ltr., WL 3406603 at 4; *see also* 29 C.F.R. §541.202(f).

**2.  Chase Has Not Produced Evidence Establishing that Mr. Clarke Exercised Discretion and Independent Judgment with Respect to Matters of Significance.**

Even if the "directly related" prong of the test were met (and it is not), Chase's motion would still fail, because Chase has not proven by undisputed facts that plaintiff's primary duties include work requiring "the exercise of discretion and independent judgment" with respect to "matters of significance."  29 C.F.R. §541.200(a)(3).

Whether an employee exercises discretion and independent judgment with respect to matters of significance is evaluated "in the light of all the facts involved in the particular employment situation," including, among other things, "whether the employee carries out major assignments in conducting the operations of the business;…whether the employee has authority to commit the employer in matters that have significant financial impact;" "whether the employee has authority to waive or deviate from established policies and procedures without prior approval; [and] whether the employee has authority to negotiate and bind the company on significant matters."  29 C.F.R. §541.202(b).  Moreover, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques."  29 C.F.R. §541.202(e).  "The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  It thus refers to those "decisions normally made by persons who formulate policy within their spheres of responsibility or who participate in this process or who exercise authority to commit the employer in a substantial respect, financial or otherwise."  *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 65 (D. Conn. 1997); *see also Ruggeri v. Boehringer Ingelheim Pharm., Inc.,* 585 F. Supp. 2d 254, 265 (D. Conn. 2008).

Chase has produced no evidence establishing that Mr. Clarke' primary duties included *any* of the indicia referenced in section 541.202(b).  The record contains considerable evidence that Mr. Clarke, rather than exercising discretion and independent judgment within the meaning of the law, at most used skill and knowledge.  Mr. Clarke repeatedly testified that he followed the rules set by Engineering.  *See supra* at 4-6; *see also* Kwan Decl. ¶¶ 5-9.  Mr. Clarke acquired

skills from his repeat interactions with Engineering, but his individual decisions were dictated by the policies Engineering set, and thus did not "involve[] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. §541.202(a); *cf.* DOL Wage & Hour Op. Ltr., 2001 WL 1558967 (identifying equipment and software needs, determining scope of work for integrating old with new, and continuing to provide support after implementation does not qualify one for any of the FLSA's exemptions).

There is no evidence that Mr. Clarke was required, expected, or, indeed, was *permitted* to exercise *independent* or real or substantial judgment or discretion. Any time he wanted to implement a significant Chase protocol, he had to seek the approval of *all* affected users as required by the Chase change-control policies. Clarke Decl. ¶¶ 27-28.

Mr. Clarke knew from experience (or reviewing Engineering Department directives) the steps required to install, maintain, and troubleshoot NPDS printing and capacity management, the areas of his responsibility. This work does not involve the exercise of independence and discretion: "Maintaining a computer system and testing by various systematic routines to see that a particular piece of computer equipment or computer application is working properly according to the specifications designed by others are examples of work that lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption." DOL Wage & Hour Op. Ltr., 2006 WL 3406603 (Oct. 26, 2006) at 5.

While to the layperson, maintaining or even troubleshooting a computer or a computer system might seem complex, courts reviewing the actual jobs of technical support workers have found that the work they do, like the work performed by Mr. Clarke, requires the application of experience and skill, but does not require the level of independent judgment or discretion relating to matters of significance required under the exemption. In *Burke v. County of Monroe,* 225 F. Supp. 2d 306 (W.D.N.Y. 2002), computer networking administrators, like Mr. Clarke, had a variety of server administration and related duties, including installing software updates and patches, advising computer groups how to configure new computers, researching and testing new

18

products, troubleshooting network problems, "independently administering systems," testing

hardware and software, troubleshooting database systems, monitoring system security, installing,

configuring and managing user accounts, and monitoring success or failure of backups.  *Id.* at

308-09.  While this work was definitely important to the employer's business, these job duties

required only the application of skills and experience, and not the exercise of independent

judgment and discretion in the performance of their work as the plaintiffs "made no independent

decisions on matters of great importance to the County's business" and were performing highly-

skilled and routine work, not exercising discretion and independent judgment with respect to

matters of significance.  *Id.* at 320-21.

The employer in *Jackson v. McKesson Health Solutions LLC*, No. 03-11177, 2004 WL

2453000 (D. Mass. Oct. 29, 2004), contended the employee at issue was exempt because he, not

unlike Mr. Clarke, maintained server hardware, diagnosed hardware problems, replaced

malfunctioning equipment, troubleshot hardware, software and network problems with little to

no supervision,[10] made suggestions regarding hardware purchases, became an expert in one

software program, and suggested cost-savings.  *Id.* at *1-2.  The court disagreed:  "By

emphasizing that 'there is not a single correct way to handle trouble tickets' and that the plaintiff

handled many of them without supervision, the defendant conflates skill with discretion and

independent judgment, thereby failing to heed the statute's warning regarding what is necessary

to establish the latter traits."  *Id.* at *6.

The court in *Turner* similarly rejected the employer's contention that its computer-system

support technicians were exempt when they troubleshot computer systems, diagnosed problems,

considered alternative solutions and determined and implemented solutions they believed to be

---

[10] The amount of supervision can never be dispositive of the exemption.  As observed in
*Martin*, 381 F.3d at 584, "While the fact that an employee works independently might shore-up a
conclusion that a worker is doing work of 'substantial importance,' that fact standing alone has
little relevance to the inquiry.  Night janitorial workers, for example, often work independently
and without direct supervision, as do any number of skilled tradesmen such as nonexempt
electricians and plumbers."

19

the best alternative. *Turner,* 292 F. Supp. 2d at 747. They were constrained by their employer's restrictions and directions as to when problems must be fixed and how systems should be set up. *Id*. While they utilized their own knowledge and skill to solve computer problems, their primary duties did not involve discretion or independent judgment as required under the regulations. *Id*.

At a minimum, the issue of whether Mr. Clarke's primary duties involved the exercise of independent judgment and discretion as to matters of significance creates genuine issues of material fact that should be resolved by jury trial.

### E. Chase Has Not Met Its Burden To Prove That Mr. Clarke Unmistakably Qualifies for the Computer Exemption.

The computer employee exemption is limited to a computer *systems analyst*, *computer programmer*, *software engineer*, or other *similarly skilled worker*, whose primary duty is –

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills . . . .

29 U.S.C. §213(a)(17); 29 C.F.R. §541.400. *See Bergquist v. Fidelity Info. Servs., Inc.*, 399 F. Supp. 2d 1320, 1330 (M.D. Fla. 2005).

The computer exemption does not apply to computer employees "engaged in the manufacture or repair of computer hardware and related equipment . . . [or] whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs . . . but who are not primarily engaged in computer systems analysis and programming or other similarly skilled computer-related occupations identified in §541.400(b)." 29 C.F.R. §541.401.

Further, when an employee's primary duties consist of lower-level work of using tools, instructions, standardized approaches and experience to build, install, integrate, maintain and support the systems and applications that others have researched, analyzed, programmed, designed and developed, these employees do not meet the narrowly construed computer employee exemption. *See* DOL Wage & Hour Op. Ltr., WL 3406603 at 5-7 (employees with the primary duty of installing, configuring, testing, and troubleshooting computer applications, networks, and hardware do not qualify for the exemption); DOL Wage & Hour Op. Ltr., 2001 WL 1558967 (computer professional exemption test not satisfied by "Systems Engineer" who engaged in "designing computer solutions" to fit client needs, involving "analyzing current equipment and software, identifying equipment and software needs, determining a scope of work for implementation and integration of old with the new, and continuing with support of hardware and software after the implementation is complete"); DOL Wage & Hour Op. Ltr., 1999 WL 33210907 (Nov. 5, 1999) (test not satisfied by "senior network administrator [who] assumes responsibility for network activities . . . ; performs computer hardware, software, Novell 4.11 and other operating system installations, tuning, troubleshooting and system integration of related components"); DOL Wage & Hour Op. Ltr., 1999 WL 1788144 (test not satisfied by employees engaged in "changing software settings and specifications to fit customer needs; testing modems; installing, debugging, troubleshooting, and converting data from the old system to the new"); *see Martin*, 381 F.3d at 580 (non-exempt duties include consulting with users "for purposes of repair and user support," and "installing and upgrading hardware and software on workstations, configuring desktops, checking cables, replacing parts, and troubleshooting Windows problems . . . to predetermined specifications in the system design created by others").

Courts applying the computer exemption have made clear that exempt "systems analysis" and "programming" work is limited to employees whose primary duties are in the realm of design and development, where business needs and problems are translated into systems that fit user needs and business imperatives. *See, e.g., id.* at 580-81 (systems analysis "involves making actual, analytical decisions" about how a computer network "should function"; employee

21

"merely ensuring that a particular machine is working properly according to the specifications designed and tested by other . . . employees" is not exempt).  Mr. Clarke did not design or develop computer systems.  Clarke Decl. ¶ 10.  His was a break/fix job.  *Id*. ¶¶ 7-11.

Chase makes much of the fact that Mr. Clarke occasionally interacted with users, but interaction is not sufficient to establish that an employee falls within the exemption.  Although the computer exemption statute and regulations mention "consulting with users," 29 U.S.C. §213(a)(17(A), they do not exempt all computer workers who consult with users.  *Cf.* DOL Wage & Hour Op. Ltr., 1999 WL 1788144 (computer exemption not satisfied by employees whose work included responding to customer needs and visiting customers to ensure satisfaction). "Consultation with users" only qualifies an employee for an FLSA exemption if that employee is *similarly skilled* to a "systems analyst, computer programmer, software engineer"; *and* consults with users as a means of "systems analysis"; *and* does so to determine "hardware, software, or system functional specifications." 29 U.S.C. §213(a)(17)(A).  Chase makes no showing that Mr. Clarke satisfied any of these additional criteria.  Mr. Clarke's work involved nothing as complex as "systems analysis."  Systems analysis is "the rigorous, often mathematical, analysis of complex situations and processes as an aid to decision-making or preparatory to the introduction of a computer."  COMPACT OXFORD ENGLISH DICTIONARY 1995 (2d ed. 2002).  It "involves making actual, analytical decisions" about how a "computer network should function." *Martin*, 381 F.3d at 580.  Mr. Clarke did not do this.  He did not apply "rigorous" mathematical techniques, analyze complex situations, or make decisions about how computer networks should function.

The few decisions Chase cites to support its claim that Mr. Clarke falls within the computer exemption only underscore that Mr. Clarke does *not* fall within the exemption.  The court in *Bagwell v. Florida Broadband, LLC*, 385 F. Supp. 2d 1316 (S.D. Fla. 2005) did not conclude the plaintiff fell within the exemption because he had acquired certain certifications, as Chase suggests.  Rather, the court applied the exemption because the plaintiff's "primary duty

was developing, improving, and making" the defendant's network system run, and in carrying out this duty the plaintiff:

> wrote specifications for wireless network topology, wrote specifications for routers and switches used in network, specified protocols used in the network, designed and assured proper installation of all cabling infrastructure including fiber optic, maintained network availability and security, interacted with clients for Level 3 support, consulted with clients for LAN design and technical specifications, interacted with vendors for pricing and availability of materials, scheduled technical field staff for surveys and installations, scheduled maintenance of network, maintained detailed network documentation, approved site installations of infrastructure and equipment, designed and implemented LAN infrastructure, recommended purchases of network equipment, and evaluated emerging technologies.

*Id*. at 1327.  Because the plaintiff had all of these duties – none of which Mr. Clarke had – the court concluded, "Plaintiff was involved in the design, development, and analysis of the computer system."  *Id*.

Similarly, in *Bobadilla v. MDRC*, No. 03-Civ-9217, 2005 WL 2044938 (S.D.N.Y. Aug. 24, 2005), the plaintiff's duties included "*designing and implementing* [defendant's] California network, a complex project that involved the performance of exempt duties, including the configuration of the new network, and the testing and modification of hardware and software." *Id*. at *7.  The plaintiff also had the following additional primary duties:

> A. Install, configure and maintain the organization's data/voice network infrastructure[;] B. Implement and integrate LAN/WAN/Web presence to the entire corporation[;] C. Manage, support, design and integrate current and future network infrastructure for the entire organization[;] D. Design, manage and support services, their operating systems, utilities and applications[;] E. Insure reliable delivery of network services on and across servers and all devices attached to the organization[']s network infrastructure[;] F. Present solutions, which would enhance the performance, upgrade, replacement or combination of technologies, directed at MDRC's technical infrastructure[; and] G. Configure LAN & WAN network infrastructure devices, understand their functionality and recognize potential problems. Proactively resolve these problems when and where possible.

*Id*.

Chase cannot meet its burden to show that Mr. Clarke qualifies for the computer employee exemption because he did not engage in such high-level activities.  Mr. Clarke's primary duty was implementing guidelines and protocols – developed by others – regarding Chase's printing and file-sharing networks.  Mr. Clarke did not make "actual, analytical decisions about how [the employer's] computer network should function."  *Bobadilla* at *8.

Finally, that Mr. Clarke cut and paste Engineering protocols for others on his team does not constitute "the design, documentation, testing, creation, or modification of computer programs." 29 U.S.C. §213(a)(17).  "Documentation" in this context "deal[s] with the *internal documentation process involved in programming and/or systems analysis*, requiring knowledge of the system architecture, programming logic and language necessary to manipulate the internal operation of the computer itself."  *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1463 (10th Cir. 1996) (emphasis in original and added).

### F.    Chase Has Not Met Its Burden To Prove That Mr. Clarke Unmistakably Falls Within the Combination Exemption.

Because Chase cannot show that there are no genuine issues of material facts as to whether Mr. Clarke clearly and unmistakably falls within the administrative or computer exemptions, it cannot show that he clearly and unmistakably fell within the combination exemption.  *See, e.g., Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990) (combination exemption allowed "only where (1) an employee performs more than one type of work that would be exempt except that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty.").  Mr. Clarke did *no* exempt work – under the administrative or computer professional exemption – and thus cannot be found exempt under the combination exemption.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, Chase has failed to demonstrate, plainly and unmistakably, that no genuine issue of material fact exists regarding Mr. Clarke's claims under the FLSA. Therefore, Chase's motion for summary judgment must be denied.

Dated: June 30, 2009                     Respectfully submitted,

                                          **OUTTEN & GOLDEN LLP**


                                          By: _/s/ Adam T. Klein___
                                               Adam T. Klein

                                          **OUTTEN & GOLDEN LLP**
                                          Adam T. Klein (AK 3293)
                                          Justin M. Swartz (JS 7989)
                                          Ossai Miazad (OM 1127)
                                          3 Park Avenue, 29th Floor
                                          New York, New York 10016
                                          Telephone:  212-245-1000

                                          **ALTSHULER BERZON LLP**
                                          James M. Finberg (admitted *pro hac vice*)
                                          Eve H. Cervantez (admitted *pro hac vice*)
                                          Peter E. Leckman (CA Bar # 235721)
                                          177 Post Street, Suite 300
                                          San Francisco, CA 94108
                                          Telephone: (415) 421-7151

                                          **LIEFF, CABRASER, HEIMANN
                                             & BERNSTEIN, LLP**
                                          Kelly M. Dermody (admitted *pro hac vice*)
                                          Jahan C. Sagafi (admitted *pro hac vice*)
                                          275 Battery Street, 30th Floor
                                          San Francisco, CA 94111-3339
                                          Telephone: (415) 956-1000